In re Show Cause Proceeding to Amend the BILLING AND COLLECTION TARIFFS OF SOUTH CENTRAL BELL, United Inter–Mountain, and General Telephone Companies.

No. 88–177–II.

Court of Appeals of Tennessee, Western Section at Nashville.

March 22, 1989.

Rehearing Denied May 3, 1989.

Permission to Appeal Denied by Supreme Court Sept. 5, 1989.

Dan H. Elrod & Cynthia E. Berry, Trabue, Sturdivant & DeWitt, for appellant, Intern. Telecharge, Inc.

C. Michael Norton, Baker, Worthington, Crossley, Stansberry & Wolf, for appellant, American Operator Services, Inc.

Henry Walker, Gen. Counsel, Tennessee Public Service Com'n.

HIGHERS, Judge.

This action is a petition for judicial review of a Final Order of the Tennessee Public Service Commission (PSC)[1] under T.C.A. § 4–5–322 (Supp.1988) requiring certain telephone companies to amend their billing procedures. It is an unusual and complex case both procedurally and substantively.

The substantive complexity of this case is mitigated by an overview of the companies and billing procedures involved. Local Exchange Companies (LEC's) are those which provide local telephone services. The LEC's may, under regulations, supply service to other exchanges (inter-exchange service) within what is known as Local Access Transport Area (LATA). Calls from an exchange in one LATA to an exchange in another (inter-LATA calls) can-

not be handled by the LEC but are handled by long distance companies. This action is concerned with non-local, operator assisted calls, the companies which provide those calls, and the methods by which those calls are billed.

Until the mid–1980's, AT & T had a virtual monopoly on operator assisted calls. Beginning at that time, several alternate operator service providers (AOS's) were formed. Entry into the operator service market by AOS's has typically been aimed at certain industrial customers rather than at the general public, and although some AOS's apparently aspire to expand into providing services for the general public, at the present these industries are the exclusive market.

At the present, marketing operator services to individual members of the public would be highly impractical for the AOS's for a number of reasons. By marketing their services to certain private industries, the AOS's reach larger segments of the public as aggregated by these industries. The target industries are those which provide telephones for use by their own clients and customers, such as hospitals, hotel/motels, and universities. Also targeted are the owners of on-premises pay phones, for example, convenience markets. These are referred to as "customer owned coin operated" telephones (COCOT's). (For convenience, COCOT's and their owners are included in references to industrial or institutional owners unless otherwise noted.)

The AOS's contract with the institutional phone owners to provide operator services for calls made from their phones. When a caller using an institutionally owned phone dials "0," he is automatically connected to the operator service provider with which the owner of that phone has contracted, be it AT & T or an AOS. The operator collects billing information from the caller—a credit card number, home telephone number, or a request for a collect call—and then completes the call. If made from a touch-tone telephone, it is possible for the caller to provide billing information and

---

**1.** By necessity this opinion is burdened with a plethora of initial letter designations for the companies, types of companies, and regulatory agencies involved.

complete his call without ever actually speaking to an operator. The caller does so by entering a credit card number upon hearing a prompt.

The regulations, which are central to this case, permit inter-exchange carriers, including AOS's, to use the billing and collection services of LEC's. Therefore, not only does the bill from the LEC include the intra-exchange and inter-exchange/intra-LATA calls handled by the LEC, it includes inter-exchange calls handled by companies other than the LEC, provided the company handling the call has a billing and collection agreement with the LEC.

The AOS's complete operator assisted calls using facilities owned by an LEC or an inter-exchange carrier (IXC), paying them under either contract or tariff. The billing and collection for the AOS's is handled by the LEC's under contract, and non-payment subjects the caller to LEC sanctions, which can mean termination of all telephone services. Some of the revenue collected goes to the carrier to pay for the facilities to handle the call. Some of the AOS revenues go to the hotel, hospital, university or COCOT owner with whom the AOS has contracted. This allocation of revenues is important to the issue in this case.

First, the AOS does not *charge* the institution with whom it contracts for its services; rather, the calls are billed to the *caller*, and the institution *shares* in the revenues. Second, the AOS's actually provide only operators and switching equipment as a part of handling a call, and rely on the LEC's and IXC's to provide the carrier facilities. The LEC's and IXC's are also paid for the services they provide.

These facts place the AOS's in a position not to be *cost* competitive, but rather *revenue* competitive. Because the AOS is trying to attract the business of the institution, it competes by offering higher returns to those telephone owners. Those higher returns come from greater revenues which in turn come from higher calling fees charged to the caller using the institution's phone. Thus the AOS is most competitive by charging the highest possible amount to the caller, and the caller is captive in that he or she did not, as a customer, choose the AOS—the institution, who shares in the revenue did. In order to avoid these excessive charges, the caller must sometimes find a telephone not under contract with the AOS. Because of lost revenues, AOS's are reluctant to transfer the calls to another long distance service even if the caller so requests. Sometimes the owner of the phone will, under its contract with the AOS, prohibit the AOS from transferring the call to another company as the telephone owner would miss his share of the AOS revenues, or possibly subject himself to having to pay for the transferred call himself.

The inconvenience of paying a higher charge or finding a phone not under a contract with an AOS is not the primary problem which the PSC attempted to address. The AOS's, like any provider, may under fundamental principles of economics, charge whatever rate the market will bear. If the AOS price is too high for a given call, that caller will either find another way to make the call, or simply not make it at all. However, callers using AOS's are often not given the opportunity to make that choice. The caller may be unaware that he or she has used an AOS until billed for the call through the billing procedure described above. This is especially true where the caller keys in a credit card number without actually talking to an operator. Thus, the AOS insulates itself from the caller by marketing not to him, but to the telephone owner, and the caller is not actually an un*will* ing consumer but an un*witt* ing one.

This unwitting use of an AOS is exacerbated by the fact that the caller may key-in or give verbally the number from an AT & T credit card with the assumption that AT & T is handling the call at a standard rate with which the caller may be familiar. In other words, the AOS is able to use the numbers from the AT & T card to determine the caller's LEC billing number, and then bill the caller through the LEC. The record contains over eight pages of excerpts from complaints which repeatedly bear out this fact. A number of these

excerpts make reference to the fact that the caller had never heard of the particular AOS which handled the call. Others make reference to the fact the caller specifically thought they were using AT & T.

There have been other complaints registered against AOS's, including the refusal of some AOS's to transfer the caller to another company as noted above. One AOS agreed to give refunds to match AT & T's rates to customers who complained about costs, but evidence indicates that such refunds were excessively delayed or never paid. Approximately 85% of the complaints received by the PSC center on two concerns: (1) Lack of knowledge that an AOS rather than AT & T was providing the service and receiving the fees; (2) excessively high rates charged for calls handled by the AOS's. In all, over 700 complaints were received by the PSC. The PSC surveyed seventeen other states, and of those states, sixteen had received complaints regarding AOS's. In Tennessee, one AOS had contracted with both Vanderbilt University and University of Tennessee to provide long distance service, representing to the administration at those universities that their rates were competitive with AT & T's rates, which at the time was true. After the contracts were signed, and without notice to the administration of either university, the AOS increased its rates to almost double the AT & T rate.

As a result of these pervasive problems, the PSC issued an order pursuant to T.C.A. § 65–2–106 (1982) directing the LEC's to amend their billing procedures or to appear and show cause why such amendment should not be made. That order was issued on February 4, 1988, and directed South Central Bell (SCB), United Inter–Mountain (UIM) and General Telephone Company (GTC) to deny provision of billing services to any AOS unless (1) the AOS establishes an account with the end user or (2) charges rates no higher than the highest intrastate tariff rates for a comparable operator assisted call. (Generally, the highest will be AT & T, since it is the only certified IXC offering operator assistance in Tennessee). The order was not directed at the AOS's, but rather reached them indirectly by regulating the LEC's which handle billing and collection for the AOS's.

Two AOS's, both appellants in this action, American Operator Services, Inc., d/b/a National Telephone Services (NTS), and International Telechange, Inc. (ITI), filed motions to intervene. The motions to intervene were granted, and ITI and NTS were made parties to the proceedings. Another AOS, Central Corporation of Tallahassee, Florida (Central), and representatives of the Tennessee Payphone Owners Association appeared at the Show Cause proceeding but are not parties to this appeal.

A public show cause hearing related to the order was held on March 14, 1988, and the PSC entered a final order at its regularly scheduled meeting on March 29. After outlining the problem briefly, emphasizing actual and potential abuses of the system, the Commission noted that regulatory commissions in Kentucky, Mississippi, and Alabama had barred AOS's. South Carolina and Florida had issued rate caps, and Virginia, a "consumer alert."

The order by the Tennessee PSC did not ban AOS's from operating in Tennessee. It did not put a blanket cap on their rates. The order did prohibit the AOS's from using the LEC's billing and collection services without establishing an account with the caller unless their rates were no more than the rates normally appearing on the caller's bill. Under the order, the AOS may still bill the calls directly to the hospital, hotel, or dormitory room or to the caller's commercial credit card at whatever rate they please. The primary objective was to prevent the unwitting use of an AOS at unexpectedly high rates by the consumers of Tennessee.

In response to contentions by NTS, ITI and Central that the order was anti-competitive, the PSC made it quite clear that they viewed the failure of the AOS's to deal directly with the consumer as an intentional rather than incidental result of LEC billing and collection:

Competition is not an issue in this proceeding. AOS carriers do not "compete"

for business; they profit from ignorance and trickery. For example, when operators of the National Telephone Service accept AT & T credit card numbers from customers without ever identifying the AOS carrier and then charge those customers two or three times more than the AT & T rate ..., that is not "competition"; it's fraud.

Final order at 6–7.

As noted earlier, this case is also procedurally unusual. Technically, this is not an appeal, but rather is a petition for judicial review under T.C.A. § 4–5–322 (Supp.1988), which is a part of the Uniform Administrative Procedure Act as adopted in Tennessee. Specifically, this case comes to this Court under T.C.A. § 4–5–322(b)(1) (Supp. 1988) which provides that a "person who is aggrieved by any final decision of the public service commission ... shall file any petition for review with the middle division of the court of appeals."

Appellant NTS has asserted that our standard of review in deciding this case is, by virtue of allegations of confiscation through rate regulation, one of "independent judgment of both law and fact," citing *Ohio Valley Water Co. v. Ben Avon Borough*, 253 U.S. 287, 289 40 S.Ct. 527, 528, 64 L.Ed. 908 (1920); and *Southern Continental Telephone Co. v. Railroad and Public Utilities Commission*, 199 Tenn. 122, 285 S.W.2d 115, 116 (1955). That standard, once valid, was abandoned in Tennessee in 1977. *Public Service Commission v. General Telephone Co. of the Southeast*, 555 S.W.2d 395, 402 (Tenn.1977); *United Inter-Mountain Telephone, Co. v. Public Service Commission*, 555 S.W.2d 389, 393–394 (Tenn.1977). Those cases recognized that T.C.A. § 4–5–322(h) is constitutionally acceptable in specifying that review shall be under a substantial evidence standard. The mere allegations of confiscation, may raise constitutional issues, but it does not change the standard of review.

■ Petitioners have both filed reply briefs alleging that in its brief, the PSC violated Tennessee Court of Appeals Rule 6(b) by making arguments not based on the record and by not citing the record with sufficient specificity. At the heart of that argument is the assertion that the PSC has boot strapped on review by citing as authority for its arguments its very own orders. Tennessee Court of Appeals Rules, including Rule 6(b), are made applicable to this review by T.C.A. § 4–5–322(f) to the extent they do not conflict with the provisions of the Uniform Administrative Procedures Act. However, T.C.A. § 4–5–322(f) further provides that the "agency which issued the decision to be review is not required to file a responsive pleading." The obvious intent was that the agency be allowed to rely on the arguments as set forth in its order. That being the case, we find nothing wrong with the agency citing its own orders when it files a discretionary brief. Further, the orders are themselves a part of the record, and citations thereto are acceptable. Finally, the portions of the orders cited contain sufficient transcript and exhibit citations to support the PSC's arguments independently of its order.

■ Petitioners also assert on reply brief that the PSC has included in the appendix to its brief a copy of an article from a journal which is not part of the record and therefore not properly before this Court. T.C.A. § 4–5–322(g) confines our review to the record unless we are reviewing procedural irregularities not contained in the record. We therefore have not considered the article in our review.

ITI has raised "law of the land" and due process issues under the Tennessee and United States Constitution in that it claims to have been given inadequate notice to prepare for the hearing. In its petition to intervene, ITI stated that a "hearing in this matter should not be scheduled until after petitioner has had an opportunity to conduct discovery and prepare its case for presentation to the Commission." However, no specific requests regarding postponement were added to this general observation, and no postponements were made.

■ Whatever merit the notice issue might have had otherwise is lost in ITI's failure to make specific requests for postponement. This failure was an active, voli-

tional choice made by ITI as reflected in the transcript of proceedings, wherein counsel for ITI stated,

"In connection with the procedural deficiencies that we feel are involved in this proceeding, *we didn't ask for a postponement. We could have, but didn't.* The reason is because we had hoped we would be able to come here this morning, and establish with the Commission that the Commission has really sort of gotten off on the wrong path in this matter. And that if we can do that, that we could come up with some reasonable approach of regulation of AOS carriers, and we should be able to shorten this matter, and not drag it out over a protracted period of time (emphasis supplied)."

Counsel continued by stating that if the "reasonable approach" could not be achieved, "we are going to have to insist on this matter being continued, so that we can have an opportunity to explore these issues that I have raised." We are not cited to nor does our search of the record reveal any motions or requests for continuance or postponement or any other relief against the alleged lack of notice, until the filing of a post hearing brief.

In the context of civil litigation, our courts have long recognized that it is incumbent upon a litigant to call to the trial court's attention those errors he believes have adversely affected his case. Thus, we have consistently held that even in cases where error might exist, a litigant will not be permitted to raise questions and issues on appeal that have not first been presented to the trial court. *Lawrence v. Stanford,* 655 S.W.2d 927, 929 (Tenn.1983); *East Sevier County Utility District of Sevier County v. Wachovia Bank & Trust Co.,* 570 S.W.2d 850, 854 (Tenn.1978); and *Anderson County Quarterly Court v. Judges of 28th Judicial Circuit,* 579 S.W.2d 875, 883 (Tenn.App.1978). The trial court must be given the opportunity to correct errors in the conduct of a trial such as the erroneous admission of evidence before a litigant will be able to seek reversal on appeal. *Rhea v. Marko Construction Co.,* 652 S.W.2d 332, 334 (Tenn.1983); *Pendleton v. Evetts,* 611 S.W.2d 607, 609 (Tenn.App.1981); and *Valentine v. Conchemco, Inc.,* 588 S.W.2d 871, 877 (Tenn. App.1979).

■ These principles have equal validity in administrative proceedings. No matter how informal the proceeding, a person appearing before an administrative tribunal must make timely objections to procedural errors and must raise in a timely manner the issues and questions he deems material before he will be permitted to raise them in a petition for review. To require otherwise would undercut the effectiveness of administrative proceedings and would cause serious waste of effort by the parties and the administrative tribunal itself. We cannot on appeal grant relief not requested of the Public Service Commission.

Where a party complains about procedure but makes no request for relief until after an administrative hearing, the tribunal does not err by not providing the relief *sua sponte.* We therefore hold that ITI cannot raise in this appeal, and could not validly raise in its post hearing brief to the PSC, issues which it clearly chose not to pursue at the hearing itself.

T.C.A. § 4–5–322(h) governs the substance of our review, as set forth below:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) Unsupported by evidence which is both substantial and material in the light of the entire record. In determining the substantiality of evidence, the court shall take into account

whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Under the above-quoted statutory provision, we are given three options: We may (1) affirm the decision of the agency, or if the petitioner has been prejudiced in a manner set forth above, we may (2) reverse and remand or (3) modify the decision of the agency. Under the statute, we may remand the case for further proceedings if we determine further proceedings are necessary with or without reversal and with or without finding that the agency's decision was erroneous in any respect. *See generally Stempel v. Department of Water Resources*, 82 Wash.2d 109, 508 P.2d 166, 169 (1973); *State ex rel. Gunstone v. Washington State Highway Com.*, 72 Wash.2d 673, 434 P.2d 734, 735 (1967).

Petitioners have asserted that capping their rates at AT & T's rate level is arbitrary and capricious in that the PSC did not take into consideration all the facts and circumstances as required in rate making cases. *Southern Bell, supra;* T.C.A. § 4–5–322(h)(4). For the same reasons, petitioners assert that the order is "unsupported by evidence which is both substantial and material in light of the entire record" T.C.A. § 4–5–322(h)(5). According to petitioners, the PSC has omitted "facts and circumstances" necessary to a proper rate determination. These omissions include the relative costs of providing long distance services to both AT & T and the petitioners, capital investment and relative returns thereon, and differences between the petitioners' market and AT & T's market (e.g. AOS's claim higher fraud and uncollectibles) which affect their respective rates of return.

■ The PSC asserts that the omissions are not material to this case. The PSC concedes that they might be material to a rate regulation case, but asserts that the order is directed at billing and collection procedures of the LEC's, and is not a rate regulation case. According to the commission, the rate regulation issue was conclu-

sively addressed in the Final Order as follows:

> We are not concerned with AOS prices except when those charges appear on a ratepayer's local telephone bill without his knowledge or consent. When that occurs, we have concluded that the customer should pay no more than the regulated rate for those calls. Whether or not those rates, which we have found to be just and reasonable for AT & T and the local carriers, are also "fair" to AOS carriers or include commissions for hotels, hospitals, universities, or coin telephone owners is irrelevant. . . . The purpose of this Order is to force those carriers and institutions to market their services directly to ratepayers or find other ways to collect their bills. (Citations omitted.)

Final Order, 10, fn. 15. Thus, the PSC clearly admits that it did not consider data relevant to rate determination.

Whatever arguments may be made in favor of the Commission's Final Order, it cannot be denied that in making it, the Commission is regulating rates, albeit under limited circumstances. The PSC's order gives the AOS's alternate instructions: (1) establish enduser accounts or (2) bill no more than AT & T. The first is purely a billing procedure regulation, and the second, a rate regulation. The AOS must obey one or the other. To the extent that the order amending the billing procedures constitutes rate regulation, it must be evaluated as such. When that evaluation is made, the order fails under T.C.A. § 4–5–322(h)(4) and (5) in that no evidence was taken as to costs, capital investments, relative rates of return and other factors which must be considered in order to establish rates.

■ The petitioners' argument that the rates are confiscatory, and therefore an unconstitutional taking of property, is without merit. The principle is well settled that when rates are fixed so low that a utility cannot get a fair rate or return, it amounts to a taking unless the utility is compensated by the state or the rate is established through due process of law. *Smyth v.*

*Ames,* 169 U.S. 466, 523, 18 S.Ct. 418, 425, 42 L.Ed. 819 (1898), *citing Railroad Commission cases,* 116 U.S. 307, 325, 331, 6 S.Ct. 334, 341, 344, 348, 349, 388, 391, 1191, 29 L.Ed. 636, 29 L.Ed. 650, 29 L.Ed. 651, 29 L.Ed. 636, 29 L.Ed. 652, 29 L.Ed. 636. *Southern Bell Tel. & Tel. Co. v. Tennessee Public Serv. Comm.,* 202 Tenn. 465, 304 S.W.2d 640 at 643 (1957). But there is no taking merely because the utility is limited as to the manner in which it may bill at a given rate. The PSC, in protecting the interests of the public, has told the long distance companies they must choose between limited rates when billing through an LEC or an unlimited rate under other billing procedures. Were this choice an illusory one, then the petitioners' argument might stand. But the evidence is clear that the AOS may bill a number of ways other than through an LEC, including billing to the caller's hotel, hospital or dormitory room, or to the caller's commercial credit card. There is also evidence that in time, the AOS will be able to match or beat AT & T's rates across the board. The choice is clearly not illusory, and the action of the PSC does not constitute a taking though the rate cap be so low that it economically eliminates LEC billing as a viable alternative. *See generally Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 2660, 57 L.Ed.2d 631 (1978); *Hamilton Bank of Johnson City v. Williamson County Regional Planning Commission,* 729 F.2d 402 (6th Cir.1984), *certiorari granted* 469 U.S. 815, 105 S.Ct. 80, 83 L.Ed.2d 28 (1984), *reversed* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126, (1985) *on remand* 779 F.2d 50 (6th Cir.1985).

▪ The PSC is well within its statutory authority when it endeavors to regulate the billing procedures of the LEC's and even to cap AOS rates. The PSC has "general supervision and regulation of, jurisdiction, and control over, all public utilities, and also over their property, property rights, facilities, and franchises, so far as may be necessary for the purpose of carrying out the provisions of this chapter." T.C.A. § 65–4–104 (1982). "The commission shall have power ... [t]o investigate, upon its own initiative or upon complaint in writing, any matter concerning any public utility ... [, and a]fter hearing, by order in writing, to fix just and reasonable standards, classifications, regulations, practices or services to be furnished, imposed, observed and followed thereafter by any public utility" T.C.A. § 65–4–116(1) and (3) (1982). The PSC also has

> power after hearing upon notice, by order in writing, to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof, as well as commutation, mileage, and other special rates which shall be imposed, observed, and followed thereafter by any public utility ... whenever the commission shall determine any existing individual rate, joint rate, toll, fare, charge, or schedule thereof or commutation, mileage, or other special rates to be unjust, unreasonable, excessive, insufficient, or unjustly discriminatory or preferential, howsoever the same may have heretofore been fixed or established. In fixing such rates, joint rates, tolls, fares, charges or schedules, or commutation, mileage or other special rates, the commission shall take into account the safety, adequacy and efficiency or lack thereof of the service or services furnished by the public utility.

T.C.A. § 65–5–201 (1982).

▪ Even construing these statutory provisions strictly, *Tennessee Public Service Commission v. Southern Railway Co.,* 554 S.W.2d 612, 613 (Tenn.1977); *See generally South Central Bell Telephone Co. v. Tennessee Public Service Commission,* 675 S.W.2d 718, 719 (Tenn.App.1984), it is clear that the PSC is within its authority. The PSC made the determination, based on a number of complaints, that the billing and collection procedures, although not necessarily inherently unjust, often resulted in unjust or at best insufficient billing of long distance customers. There is nothing in the statutory grant of power which requires the PSC to conduct all its regulatory powers directly. If the PSC must regulate directly or not at all as asserted by petitioners, the PSC was beyond

its statutory authority in allowing the LEC's to provide billing and collection services for the AOS's in the first place. Such an action constitutes indirect regulation of AOS billing practices. Under the logic asserted by the petitioners, this regulation would not be permissible under the statutes.

In summary, to the extent that the final order constitutes rate regulation, it is arbitrary and capricious in that the PSC did not have sufficient evidence to evaluate and establish rates. In all other respects the order was within the statutory and constitutional authority granted to the PSC under the relevant statutes and the constitutions of Tennessee and the United States. Pursuant to T.C.A. § 4–5–322(h), as the reviewing Court, we therefore strike that part of the final order which improperly regulated rates and modify the Final Order to read as follows:

> No local exchange carrier shall be permitted to provide billing and collection services to a long distance service provider or carrier unless the long distance service provider or carrier has established an account with the end user being billed by customer subscription, use of an inter-exchange carrier credit card, commercial credit card, or other evidence of customer choice of the particular long distance service provider or carrier, and the establishment of such an account is certified to the local exchange carrier.

Pursuant to T.C.A. § 4–5–322(j), the findings of fact and conclusions of law by this Court as set forth in this opinion become a part of the record of this action, which is hereby remanded to the Public Service Commission for further proceedings and/or execution not inconsistent with this opinion. Costs on appeal are taxed equally against all parties.

CRAWFORD and CANTRELL, JJ., concur.