IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 19, 2002 Session

CHRISTINA K. YEUBANKS, INDIVIDUALLY, AND AS NATURAL PARENT AND
SURVIVING NEXT OF KIN OF SARAH NICOLE ANDERSON
V.
METHODIST HEALTHCARE-MEMPHIS HOSPITALS D/B/A
LE BONHEUR CHILDREN'S MEDICAL CENTER, INC.,
AMY L. HERTZ, M.D., S. DOUGLAS HIXSON, M.D., AND
PEDIATRIC SURGICAL GROUP, INC.

Appeal from the Circuit Court for Shelby County
No. 300834-8 T.D.     D'Army Bailey, Judge

No. W2001-02051-COA-R3-CV - Filed June 10, 2003

This is a procedurally complex medical malpractice case. A child was injured in a car accident. She was taken by helicopter to the hospital, where she died. The child's mother filed suit, alleging liability on the part of three physicians, and vicarious liability on the part of the hospital for the actions of the three physicians. She also asserted that the second physician's medical group was liable for that physician's actions. The complaint was later amended to include independent allegations of liability against the hospital. The mother voluntarily dismissed the claims against the first physician; however, the claim of liability against the hospital for the actions of the first physician remained. Immediately before the trial, the mother asserted that the hospital was liable for the actions of a fourth physician. The trial court ruled that evidence regarding a claim against the fourth physician was not admissible. Near the close of her proof, the mother voluntarily dismissed her claims against the second physician and his medical group. At the conclusion of the mother's proof, the trial court granted motions for directed verdict for the claims based on the independent actions of the hospital and for the claims against the hospital based on the actions of the first physician. The trial court then denied a motion for directed verdict on the claim of vicarious liability against the hospital for the actions of the third physician. The trial court then heard a motion to strike testimony related to claims against the third physician. Prior to a ruling on the motion, the mother voluntarily dismissed the claims against the third physician and against the hospital based on the actions of the third physician. The trial court awarded costs against the mother and ordered that, prior to refiling her case, the mother would be required to pay the costs. The mother appeals, arguing that consideration of the motions for directed verdict was premature, that the trial court's decision is not final and appealable, that the trial court improperly excluded evidence on claims that the hospital was liable for the actions of the fourth physician, that the trial court erred in granting the motion for directed verdict for the independent claims of negligence against the hospital, and that

the trial court erred in awarding costs against the mother and in requiring her to pay those costs prior to refiling her case. We reverse the portion of the trial court's decision requiring the mother to pay the awarded costs prior to refiling her case. The remainder of the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

T. Robert Hill, Frankie E. Wade, and Randall J. Phillips, Jackson, Tennessee, for appellant, Christina K. Yeubanks, individually, and as natural parent and surviving next of kin of Sarah Nicole Anderson.

Gary K. Smith, James T. McColgan, and Karen M. Campbell, Memphis, Tennessee, for appellee, Le Bonheur Children's Medical Center.

Teresa J. Sigmon and Claire M. Cissell, Memphis, Tennessee, for appellee, Amy L. Hertz, M.D.

Albert C. Harvey and Marcy L. Dodds, Memphis, Tennessee, for appellee, S. Douglas Hixson, M.D. and Pediatric Surgical Group, Inc.

## OPINION

On the evening of February 17, 1998, Sarah Nicole Anderson ("Sarah"), age nine, was riding in a car driven by her mother, Plaintiff/Appellant Christina K. Yeubanks ("Yeubanks"). The car was involved in an accident, and Sarah was seriously injured. She was flown by helicopter to Le Bonheur Children's Medical Center ("Le Bonheur").

At Le Bonheur, Sarah was treated by Amy Hertz, M.D. ("Dr. Hertz"), an emergency room physician. Also in the Le Bonheur emergency room at the time were William David Dunavant, III, M.D. ("Dr. Dunavant"), a resident, and Pablo Lezama, M.D. ("Dr. Lezama"), a pediatric surgery fellow. They were assisted by two additional residents, two nurses, and other supporting personnel. S. Douglas Hixson, M.D. ("Dr. Hixson"), a surgeon, was on call.

After the initial assessment, Sarah was sent to the Le Bonheur radiology department for CAT scans. She was accompanied by Dr. Dunavant, Dr. Lezama, and two other Le Bonheur employees. While in radiology, Sarah became unresponsive. She was returned to the emergency room just before midnight. Sarah's health continued to decline. Despite resuscitation efforts, Sarah died on the morning of February 18, 1998.

On February 16, 1999, Yeubanks filed a lawsuit on her own behalf and on behalf of Sarah. Yeubanks named as defendants Dr. Hertz, Dr. Dunavant, and Dr. Hixson. She also sued Le Bonheur, under the doctrine of respondeat superior, based on the actions of Dr. Hertz, Dr. Dunavant,

Dr. Hixson, and Le Bonheur's "other employees or agents." Yeubanks alleged liability under the doctrine of respondeat superior against Dr. Hixson's employer, Pediatric Surgical Group, Inc. ("Pediatric Surgical Group"). Yeubanks contended that "[a]s a direct and proximate result of the defendants' negligence, Sarah Anderson died before her injuries were properly diagnosed and treated." The complaint sought $500,000 in damages on behalf of Sarah, and $1,000,000 in damages on Yeubanks's behalf.

Responsive pleadings filed by Dr. Hixson and Pediatric Surgical Group, Dr. Hertz, and Le Bonheur included the defense of comparative fault, alleging fault against Yeubanks and the other co-defendants. On October 15, 1999, Dr. Dunavant was dismissed from the lawsuit with prejudice.[1] While Dr. Dunavant was dismissed as a defendant, the allegations against Le Bonheur for vicarious liability based on Dr. Dunavant's actions remained at issue.[2]

On February 29, 2000, Yeubanks amended her complaint. The amended complaint added allegations of negligence and misrepresentation against Le Bonheur. The amended complaint also revised the amount of damages prayed for, seeking $2,000,000 in damages on behalf of Sarah for her wrongful death and $1,000,000 in damages on Yeubanks's behalf for loss of companionship, consortium, love, and affection. The amended complaint also sought $500,000 in damages on behalf of Sarah's younger sister for loss of companionship, love, and affection, and $250,000 in damages on behalf of each of Sarah's maternal grandparents. Le Bonheur's answer to the amended complaint asserted that the independent claims of negligence against Le Bonheur were time-barred.

On the eve of trial, Yeubanks filed a pre-trial brief which included an allegation that Le Bonheur was vicariously liable for the actions of Dr. Lezama. In response, at the outset of the trial, Le Bonheur filed a motion to dismiss as time-barred the portion of Yeubanks's amended complaint asserting independent liability on the part of Le Bonheur, as well as the claim asserted in the pre-trial brief that Le Bonheur was liable for the actions of Dr. Lezama. As to the allegations of liability against Le Bonheur in the amended complaint, the trial court found that they were not time-barred because Le Bonheur's liability arose out of the original transaction or occurrence, and thus related back to the original complaint.

The trial court next addressed the assertion that Le Bonheur was liable for the acts or omissions of Dr. Lezama. The trial judge focused on whether the allegations from the original complaint against Dr. Hertz, Dr. Hixson, and Dr. Dunavant, coupled with a catchall allegation asserting Le Bonheur's vicarious liability for the actions of its "other employees or agents," stated

---

[1] Dr. Dunavant, as an employee of The University of Tennessee, was entitled to absolute immunity for his actions. Tenn. Code Ann. § 9-8-307(h) (1999) ("State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain. . . .).

[2] *See Johnson v. Le Bonheur Children's Med. Ctr.*, No. W1999-01719-COA-RM-CV, 2000 Tenn. App. LEXIS 350, at *10-11 (Tenn. Ct. App. May 25, 2000), *aff'd by* **Johnson v. Le Bonheur Children's Med. Ctr.**, 74 S.W.3d 338, 346 (Tenn. 2002).

a claim against Le Bonheur based on Dr. Lezama's actions. Le Bonheur's counsel maintained that Yeubanks's pre-trial brief was Le Bonheur's first notice that Yeubanks intended to assert a claim against Le Bonheur for the acts or omissions of Dr. Lezama. Consequently, Le Bonheur's counsel said that Le Bonheur was not prepared to defend against allegations of vicarious liability based on Dr. Lezama's actions. In response, Yeubanks's counsel stated that Le Bonheur was on notice that Yeubanks was asserting a claim arising out of Dr. Lezama's actions because the original complaint included a general allegation of vicarious liability against the hospital for the actions of its employees and agents, and contended that Yeubanks was not required to name each one of them. Yeubanks's counsel argued that Le Bonheur was further placed on notice because the amended complaint alleged that Le Bonheur was liable for "allow[ing] unlicensed foreign students to practice medicine in the facility," presumably implying that this was a reference to Dr. Lezama. Yeubanks's counsel asserted that other pre-trial documents put Le Bonheur on notice that she was pursuing vicarious liability claims based on Dr. Lezama. The other pre-trial documents included a motion for summary judgment and a request for admissions, both of which mentioned Dr. Lezama. Yeubanks noted that expert witnesses had been questioned in depositions about Dr. Lezama's lack of care, and that interrogatory responses had identified expert witnesses who were prepared to testify with respect to Dr. Lezama's deviation from the standard of care. Yeubanks admitted that Dr. Lezama was not named in either the original or the amended complaint. Yeubanks's counsel protested that he had insufficient time to respond to Le Bonheur's motion. Nevertheless, the trial judge orally granted Le Bonheur's motion, disallowing proof at trial regarding the assertion that Le Bonheur was liable based on the actions of Dr. Lezama. This oral ruling was memorialized in a written order filed June 28, 2001.

At the trial, Yeubanks offered the testimony of three expert witnesses, Shelly Cohen ("Cohen"), a registered nurse; Dr. James Calvert Jones ("Dr. Jones"), an emergency room physician; and Dr. Jeffrey Swetnam ("Dr. Swetnam"), a surgeon. Cohen testified regarding the independent allegations of negligence by Le Bonheur. She asserted that Le Bonheur failed to ensure the immediate availability of experienced individuals to provide well-organized care, and failed to provide the personnel listed to assist in a trauma alert. Thus, Le Bonheur's treatment of Sarah fell below the recognized standard of care. Cohen asserted that the Le Bonheur respiratory therapist failed to follow the appropriate trauma protocol, that the charting of input and output of fluids was insufficient and below the standard of care, and that the nurses lacked the knowledge of the fluids. Cohen asserted that the care of two nurses did not meet the standard of care for a nurse. She also asserted that the taking of vital signs was not done with sufficient frequency, that the nurses failed to properly monitor and assess the situation, and that the recording chart contained gaps that were unacceptable. Cohen also contended that the trauma team failed to meet the applicable standard of care. Cohen's testimony did not address whether the deviation from the standard of care by any of these persons caused Sarah's death.

Yeubanks's second expert was Dr. Jones. Dr. Jones's testimony focused on Dr. Hertz. He stated generally that Dr. Hertz's actions fell below the standard of care for the medical community. When asked if this deviation from the standard of care was the proximate cause of Sarah's death, Dr.

Jones stated that "I felt that Sarah's death was caused by a failure to recognize and stop the internal bleeding in time. . . ."

Finally, Yeubanks offered the expert testimony of Dr. Swetnam, a surgeon. Dr. Swetnam noted that no objective data regarding Sarah's condition was recorded between 10:30 p.m. and 11:20 p.m. on the night she was at Le Bonheur. He testified that the actions of nurse Stephanie Plunk ("Plunk"), an employee of Le Bonheur, fell below the standard of care in that she failed to properly document Sarah's record. On direct examination, when asked what injuries Sarah sustained as a result of this deviation from the standard of care, Dr. Swetnam stated that

> in my opinion, if the documentation had been adequate, then maybe somebody would have picked up sooner that she, indeed, was in shock and that she was not stable and she should not have been in CAT scan. At that point, it's possible that things could have been revved up and a different track taken so that she could have gotten to the operating room where she needed to be.

Dr. Swetnam then agreed that Sarah "suffered injuries or ultimately death" because of the failure to properly document her condition.

When questioned about this assertion on cross-examination, Dr. Swetnam conceded that the words "maybe" and "possibly" "would not be adequate to state to a reasonable medical certainty a diagnosis" that Dr. Swetnam would make for a patient. Dr. Swetnam acknowledged that he did not know whether anyone looked at Plunk's documentation on Sarah or was aware whether Plunk's documentation was "a hundred percent complete, zero percent complete or somewhere in between . . . ."

The proof showed that, while Sarah was in the radiology room and the resuscitation room, she was monitored either by a "dynamount" machine or a "propac" machine, each of which recorded and displayed her vital signs. Dr. Swetnam agreed that the information that Dr. Lezama or Dr. Dunavant would have needed would have been available to them on the monitors, and therefore their actions would have been unaffected by what Plunk did or did not record. Dr. Swetnam testified on cross-examination:

> Counsel: I think, or at least I thought that we had gotten to an agreement on this point, and that is simply this, that on that night, the things that were not documented were, one, available, and, two, you cannot point to a single assessment, evaluation, examination, decision of any kind that was made for Sarah Anderson by the doctors that was based on anything that was either in or not in the documentation by Ms. Plunk, don't you agree with that?

> Dr. Swetnam: We can assume that.

Counsel: And that is where we were earlier, and with that assumption, you would have to agree that the lack of documentation did not contribute to the death because they were not using that documentation to make their decisions; agreed?

Dr. Swetnam: We can assume that.

Counsel: Do you agree?

Dr. Swetnam: With the previous caveat that the blood pressures were actually taken, yes.

Counsel: And you have no information that they were not?

Dr. Swetnam: No, I do not.

Thus, in his testimony, Dr. Swetnam ultimately agreed that the lack of documentation did not contribute to Sarah's death.

On July 17, 2001, Yeubanks filed a notice of voluntary dismissal as to the claims against Dr. Hixson and his employer, Pediatric Surgical Group. Yeubanks's claims against Le Bonheur for its own actions and the actions of Dr. Dunavant and Dr. Hertz remained at issue. Yeubanks then concluded the entirety of her presentation of proof.

After Yeubanks closed her proof, Le Bonheur moved for a directed verdict on the claims against Le Bonheur arising out of its own alleged acts of negligence. The trial court granted the motion. The trial judge stated:

. . . I think [Le Bonheur's counsel] did a very skillful job of cross examination, and I think that when he finished cross examining Dr. Swetnam as to his statement that the lack of documentation contributed to the outcome, I think that Dr. Swetnam's opinion was speculative as to what might have happened, what might not have been observed by the doctors. He admitted on cross examination the presence of other types of instrumentation in both the resuscitation room or the emergency room and the CT room, where the doctors could observe the vital data, and he could not point to any evidence that the doctors were unaware of the vital data or even that the doctors read any of the documentation of the nurses during these proceedings. And of course as a practical matter one would think, if you take the logical inferences of the total testimony here, that if a doctor is at a patient working, that they are more likely to observe the continuing digital or other display of these vital signs, that the doctor conceded was before them, than they are to stop and look at the notes of the recording nurse who is there in the room writing these things down for that information. But whether one draws that inference or not, the opinion of Dr. Swetnam that the deviation from the standard of care in the recording does not

approach the degree of medical certainty as to causation that in the Court's mind can make this a case of controversy for the jury.

 . . . .

  The question is causation. I have listened to the entire trial testimony, I've read the pages cited from the testimony of Dr. Swetnam, I've looked back at my notes, and I do not find in any of that proof presented by [Yeubanks] that would rise to the level sufficient to send to the jury the issue of proximate cause with regard to the claimed deviations under the standard of care by the two nurses as it relates to the death of Sarah Anderson. . . .

  . . . .

  I don't think liability—I think that there are good reasons why our law is well-steeped in the view that fault is defined as both negligence and proximate cause, and while there is negligence in this case, at least as testified to by Dr. Swetnam and as in essence agreed to by [Le Bonheur's counsel], the second prong is causation, and I do not believe that [Yeubanks] has carried the burden such that on the issue of the lack of documentation causing the death of this child.

  Accordingly, I'm going to grant the motion for directed verdict as it relates to Le Bonheur Hospital at least as it relates to the two nurses and any claimed failure to follow the standard with regard to the documentation.

Thus, the trial court found that Yeubanks's expert witnesses failed to establish that any actions of Le Bonheur caused Sarah's injury or death, and therefore granted Le Bonheur's motion for directed verdict on this claim.

 Le Bonheur then moved for a directed verdict on the claim against Le Bonheur based on the actions of Dr. Dunavant. This motion was granted because of the lack of proof that Dr. Dunavant's care of Sarah fell below the applicable standard of care, or that his care proximately caused or contributed to Sarah's injuries. Finally, Le Bonheur moved for a directed verdict on the claim against Le Bonheur based on the actions of Dr. Hertz. The trial court denied this motion. Dr. Hertz's counsel moved to strike Dr. Jones's testimony, asserting that his testimony did not establish that Dr. Hertz's actions deviated from the standard of care or caused Sarah's death. The trial judge indicated that he was uncertain whether causation had been established as to Dr. Hertz, and said he would render a decision the following day.

 The next day, prior to the trial court's ruling on the motion to strike Dr. Jones's testimony, Yeubanks filed a notice of voluntary dismissal of the claims against Dr. Hertz and the claim against Le Bonheur for Dr. Hertz's actions. That same day, pursuant to section 20-12-127 of the Tennessee Code Annotated, Yeubanks filed a pauper's oath, asserting that she was not able to bear the expenses of the action. There was no hearing on Yeubanks's assertion that she was a pauper.[3]

---

[3]Yeubanks also filed a motion to proceed as a pauper during this appeal.

On July 19, 2001, the trial court entered a written order on its rulings on Le Bonheur's motions. At this point, there were no further claims pending.

Under Tennessee Rule of Civil Procedure 54.04, Dr. Hixson and Pediatric Surgical Group, Dr. Hertz, and Le Bonheur moved for discretionary costs in the amount of $76,710.74. In addition, pursuant to Tennessee Rule of Civil Procedure 41.04, they asked that Yeubanks be required to pay the discretionary costs prior to refiling her case against these defendants. After a hearing on the issue, the trial court awarded $36,401.35 in discretionary costs. Further, the trial judge ordered that if Yeubanks refiled her case, "all proceedings against these Defendants will be stayed until the Plaintiff has paid the above-awarded discretionary costs."

On appeal, Yeubanks argues that the grants of directed verdict in favor of Le Bonheur are in contravention of Tennessee Rule of Civil Procedure 50.01; that the orders of directed verdict and the other pre-trial orders are not final and appealable under Tennessee Rule of Civil Procedure 54.02; that the trial court erred in not permitting Yeubanks to introduce evidence regarding the claim against Dr. Lezama; that the trial court erred in granting a directed verdict in favor of Le Bonheur for its alleged acts of negligence; that the trial court abused its discretion in awarding discretionary costs against Yeubanks, despite her pauper's oath, and that it erred in ordering her to pay those costs prior to refiling her case.

Dr. Hixson and the Pediatric Surgical Group, as well as Dr. Hertz, assert that Yeubanks's appeal is frivolous as it relates to them, since they were nonsuited, and seek costs and expenses on appeal.

This Court reviews the trial court's legal conclusions *de novo* with no presumption of correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

Yeubanks first argues that the trial court prematurely considered the defendants' motions for directed verdict. In support, Yeubanks cites Rule 50.01 of the Tennessee Rules of Civil Procedure:

> A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. *The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief.* A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for

directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

Tenn. R. Civ. P. 50.01 (emphasis added). Thus, under this rule, when parties to a suit allege comparative fault, the trial court is to reserve its ruling on a motion for directed verdict until all the parties alleging comparative fault have presented their proof-in-chief.

In this case, it is undisputed that Le Bonheur, Dr. Hertz, and Dr. Hixson and Pediatric Surgical Group alleged comparative fault. Le Bonheur made three separate motions for directed verdict at the close of Yeubanks's proof, prior to the proof-in-chief of any of the defendants. Two of Le Bonheur's motions for directed verdict were granted at that point. Yeubanks asserts that the word "shall" in Rule 50.01 is mandatory, and therefore, this Court should vacate the grants of directed verdict in favor of Le Bonheur. Le Bonheur responds that Yeubanks's counsel failed to object to consideration of the motions for directed verdict at that time, thus waiving the argument for appeal.

The courts of Tennessee have long held that "it is incumbent upon a litigant to call to the trial court's attention those errors he believes have adversely affected his case." *In re South Central Bell*, 779 S.W.2d 375, 380 (Tenn. Ct. App. 1989) (citing *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *East Sevier County Util. Dist. of Sevier County v. Wachovia Bank & Trust Co.*, 570 S.W.2d 850, 854 (Tenn. 1978); *Anderson County Quarterly Court v. Judges of 28th Judicial Circuit*, 579 S.W.2d 875, 883 (Tenn. Ct. App. 1978)); *see also Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); Tenn. R. App. P. 3(e) & cmt.;[4] 2 Tenn. Juris., Appeal and Error, § 43 n.13.[5] "The trial court must be given the opportunity to correct errors in the conduct of a trial . . . before a litigant will be able to seek reversal on appeal." *In re South Central Bell*, 779 S.W.2d at 795 (citing *Rhea v. Marko Constr. Co.*, 652 S.W.2d 332, 334 (Tenn. 1983); *Pendleton v. Evetts*, 611 S.W.2d 607,

---

[4] Rule 3(e) of the Tennessee Rules of Appellate Procedure, and its accompanying comment states in part:

> . . . [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, *or other action committed or occurring during the trial of the case*, or other ground upon which a new trial is sought, *unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.*

Tenn. R. App. P. 3(e) (emphasis added). The comment to this Rule states: "Failure to present an issue to the trial court, therefore, will typically not merit appellate relief. . . ." Tenn. R. App. P. 3(e) cmt.

[5] Tennessee Jurisprudence states:

> The chancellor cannot be put in error for failing to pass on exceptions to depositions where it is not shown by the record that his attention was ever called to the exceptions or any action invoked by him thereon, or that he even so much as knew of such exceptions. In such case, such exceptions will be considered as waived.

2 Tenn. Juris., Appeal and Error, § 43 n.13 (citing *Wells v. Jenkins*, 7 Tenn. Civ. App. (Higgins) 566 (1917)).

609 (Tenn. Ct. App. 1981); *Valentine v. Conchemco, Inc.*, 588 S.W.2d 871, 877 (Tenn. Ct. App. 1979)).  Thus, an issue raised for the first time on appeal may be waived.  *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996).

In the case at bar, Le Bonheur made three separate motions for directed verdict.  At no time did Yeubanks's counsel object to the trial court's consideration of the motions as premature or untimely.  Indeed, Yeubanks made substantive arguments opposing the motions.  Moreover, Yeubanks filed no post-trial motion indicating that the trial court's consideration of the motions for directed verdict was premature or untimely.  On appeal, Yeubanks asserts that a dialogue that occurred between counsel and the trial judge demonstrates that Yeubanks attempted to object to consideration of the motion for directed verdict, but was interrupted by the trial court.  The transcript of the exchange, however, does not bear out this assertion.  Under these circumstances, we must conclude that this issue is waived on appeal.

Yeubanks argues next that the trial court's orders for directed verdict and on pre-trial motions are not final and appealable orders under Rule 54.02 of the Tennessee Rules of Civil Procedure.  Rule 54.02 outlines the method by which the trial court can make final and appealable an order that would otherwise not be a final order:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the Court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.  In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

Tenn. R. Civ. P. 54.02.

Here, Yeubanks filed suit against three doctors, one hospital, and one pediatric group.  Dr. Dunavant was dismissed with prejudice based on his immunity; Dr. Hixson and Pediatric Surgical Group were voluntarily dismissed; Le Bonheur was orally granted a directed verdict for the actions of its employees and for the actions of Dr. Dunavant; Dr. Hertz was voluntarily dismissed, as was Le Bonheur for the actions of Dr. Hertz.  The trial court then entered written orders reflecting the grants of directed verdict.  Thus, by the time the trial court entered the orders for directed verdict, there were no defendants remaining in the case and no issues remaining to be adjudicated, except costs.  Under these circumstances, the orders must be considered final and appealable, and Rule 54.02 would be inapplicable.  This issue is without merit.

Yeubanks asserts next that the trial court improperly granted Le Bonheur's pre-trial motion to dismiss claims against Le Bonheur for vicarious liability and under the doctrine of respondeat superior for the actions of Dr. Lezama. While Le Bonheur's motion was couched as a motion to dismiss, and the trial court's ruling was a grant of that motion, we must determine the true nature of the trial court's ruling in order to apply the appropriate standard of review. Here, neither the original complaint nor the amended complaint included a claim which specified that Yeubanks sought to hold Le Bonheur liable for the acts or omissions of Dr. Lezama. The trial court examined whether Le Bonheur was placed on notice that Yeubanks sought to assert such a claim, and found that it had not. Thus, rather than dismissing an existing claim, the trial court ruled in effect that Yeubanks had not asserted such a claim until immediately before the trial. Consequently, Yeubanks was precluded from introducing evidence at trial to establish Dr. Lezama's wrongful acts or omissions and Le Bonheur's liability for them. The trial court's ruling, therefore, must be considered an evidentiary ruling, reviewed on appeal under an abuse of discretion standard. *See Rothstein v. Orange Grove Ctr., Inc.*, 60 S.W.3d 807, 811 (Tenn. 2001); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992) (citations omitted) ("When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion.").

In considering Le Bonheur's motion, the trial judge asked Yeubanks to show where in the original or amended complaint Le Bonheur would have been put on notice that it was being held responsible for the actions of Dr. Lezama. Yeubanks directed the trial judge to the language from the original complaint alleging vicarious liability against Le Bonheur for the actions of "Drs. Hertz, Dunavant, and Hickson, [sic] and its other employees or agents, under the doctrine of respondeat superior," as well as the amended complaint, which indicated that Le Bonheur was liable for "[a]llow[ing] unlicensed foreign students to practice medicine in its facility." The trial judge found that this language did not state a claim of "master/servant or agency liability of Le Bonheur for Dr. Lezama." The trial court inquired further about other documents in the record that would have put Le Bonheur on notice that Yeubanks was seeking to hold Le Bonheur liable for Dr. Lezama's acts or omissions. The trial judge reviewed a response to a motion for summary judgment and a request for admissions, and inquired about pending expert testimony regarding Dr. Lezama's actions.[6] After doing so, the trial court granted Le Bonheur's motion as to claims based on the actions of Dr. Lezama. Considering all of the circumstances, we cannot conclude that the trial court erred in

---

[6]Approximately three weeks after the trial court's decision, counsel for Yeubanks orally moved to reconsider the ruling regarding Dr. Lezama. Counsel filed an exhibit with the trial court of documents indicating that Le Bonheur was on notice that Yeubanks would be pursuing claims against Le Bonheur for the actions of Dr. Lezama. The exhibit included Le Bonheur's response to a motion for summary judgment and memorandum of supporting law in which it denied that Dr. Lezama was an agent, employee, or servant of Le Bonheur, and that Dr. Lezama was an independently contracted doctor; and Yeubanks's motion for partial summary judgment in which it alleged that Le Bonheur was legally liable for the negligence of Dr. Lezama. There is no indication in the trial record that the trial judge ruled on the motion to reconsider. Consequently, we review on appeal the trial court's ruling on Le Bonheur's original motion, and examine the pleadings brought to the trial judge's attention at that time. Similarly, Yeubanks's appellate brief notes that, in response to an interrogatory propounded by Le Bonheur requesting the names of individuals for whom Yeubanks claimed Le Bonheur was vicariously liable, Yeubanks named, among others, Dr. Lezama. However, nothing in the record indicates that this interrogatory response was brought to the attention of the trial judge.

finding that Yeubanks had not previously asserted a claim against Le Bonheur based on the actions of Dr. Lezama, or that the trial court abused its discretion in precluding Yeubanks from introducing evidence to support such a claim.

Yeubanks argues next that the trial court erred in granting Le Bonheur's motion for directed verdict regarding the claim against Le Bonheur based on the actions of its nurses and Dr. Dunavant. Yeubanks asserts that the record contains material evidence to support the claim, and that Le Bonheur's motion should have been denied.

In considering a motion for directed verdict, both the trial court and the appellate court must look at all of the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences in favor of that party. All countervailing evidence must be disregarded, and if there is then any dispute as to any material fact, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995). A directed verdict cannot be sustained if there is material evidence in the record that would support a verdict for the plaintiff under any of the theories the plaintiff has advanced. *Id.*

Under Tennessee law, to support a claim for medical malpractice, the plaintiff must prove the following three elements:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (Supp. 2002); *see also Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). Thus, the plaintiff must demonstrate the appropriate standard of care, show that the defendant deviated from that standard, and finally, connect the deviation from the standard of care to the injury sustained by the patient. A plaintiff must "prove that it is more likely than not that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred." *Kilpatrick v. Bryant*, 868 S.W.2d at 602 (quoting *Boburka v. Adcock*, 979 F.2d 424, 429 (6th Cir. 1992)). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty

of the court to direct a verdict for the defendant . . . ." *Id.* (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)). Thus, the supreme court continued,

> proof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.

*Id.* (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d at 861-62).

In the case at bar, both nurse Cohen and Dr. Swetnam testified that the care by the nurses at Le Bonheur fell below the established standard of care. Cohen's testimony did not address the issue of causation. Dr. Swetnam, however, was questioned on direct examination regarding how the nurses' failure to properly document Sarah's record impacted her. Dr. Swetnam stated:

> in my opinion, if the documentation had been adequate, then *maybe* somebody would have picked up sooner that she, indeed, was in shock and that she was not stable and she should not have been in CAT scan. At that point, it's *possible* that things could have been revved up and a different track taken so that she could have gotten to the operating room where she needed to be.

(Emphasis added). Moreover, on cross-examination, Dr. Swetnam acknowledged that no assessment, evaluation, examination, or decision made for Sarah was based upon anything that was either included or not included in the nurses' documentation.

Based on this testimony, the trial judge stated:

> . . . I think that Dr. Swetnam's opinion was speculative as to what might have happened, what might not have been observed by the doctors. . . . [T]he opinion of Dr. Swetnam that the deviation from the standard of care in the recording does not approach the degree of medical certainty as to causation that in the Court's mind can make this a case of controversy for the jury.
> . . . .
> The question is causation. I have listened to the entire trial testimony, I've read the pages cited from the testimony of Dr. Swetnam, I've looked back at my notes, and I do not find in any of that proof presented by [Yeubanks] that would rise to the level sufficient to send to the jury the issue of proximate cause with regard to the claimed deviations under the standard of care by the two nurses as it relates to the death of Sarah Anderson. . . .

We find no error in the trial court's decision. Accordingly, the trial court's grant of Le Bonheur's motion for directed verdict on the claim against it arising out of the actions of its nurses and Dr. Dunavant is affirmed.[7]

Yeubanks also argues that the trial court abused its discretion in awarding discretionary costs because they were punitive in nature and because she is proceeding as a pauper.

Near the conclusion of the trial, Yeubanks filed a pauper's oath. Subsequently, the defendants who had already been voluntarily dismissed moved to recover costs in the amount of $76,710.74. *See* Tenn. R. Civ. P. 54.04(2),[8] 41.04.[9] After a hearing, the trial judge awarded $36,401.35 in discretionary costs. Such costs are awarded at the trial court's discretion, and the award will not be overturned unless it evinces an abuse of that discretion. Stalsworth v. Grummons, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2001) (citing Perdue v. Green Branch Mining Co., 837 S.W.2d 56, 60 (Tenn. 1992)).

Here, Yeubanks asserts that the trial court abused its discretion in awarding the costs because the costs were punitive, and because she is proceeding as a pauper. After reviewing the record we find that the trial court's order was not punitive in nature, but rather, was the result of consideration of all of the factors involving a trial that lasted almost six weeks and resulted in the trial court's

---

[7]With regard to the directed verdict for Le Bonheur's vicarious liability for the actions of Dr. Dunavant, it appears that no medical expert offered testimony regarding Dr. Dunavant's alleged negligence or the causal relationship between his actions and Sarah's death.

[8] Rule 54.04 states in part:

Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment. The trial court retains jurisdiction over a motion for discretionary costs even though a party has filed a notice of appeal. The court may tax discretionary costs at the time of voluntary dismissal.

Tenn. R. Civ. P. 54.04(2).

[9]Rule 41.04 states:

If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the Court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the new action until the plaintiff has complied with the order.

Tenn. R. Civ. P. 41.04.

dismissal of claims against some defendants and the plaintiff's voluntary dismissal of claims against other defendants.

Plaintiff contends that the trial court abused its discretion in awarding costs because she was proceeding as a pauper under section 20-12-127 of the Tennessee Code Annotated, which states:

(a) Any civil action may be commenced by a resident of this state without giving security as required by law for costs and without the payment of litigation taxes due by

(1) Filing the following oath of poverty; . . .and

(2) Filing an accompanying affidavit of indigency as prescribed by court rule.

(b) The filing of a civil action without paying the costs or taxes or giving security for the costs or taxes does not relieve the person filing the action from responsibility for the costs or taxes but suspends their collection until taxed by the court.

Tenn. Code Ann. § 20-12-127 (Supp. 2002). Thus, the plaintiff must file the oath and the affidavit of indigency. Here the record indicates that Yeubanks filed an oath of poverty, but it does not include an affidavit of indigency. Moreover, even when the plaintiff properly files a pauper's oath and an affidavit of indigency, the plaintiff is not relieved from paying the costs or taxes; the payment is merely suspended. *See* Robert Banks, Jr. & June F. Entman, Tennessee Civil Procedure § 4-9(b) & n.203 (1999 & Supp. 2001). Thus, the trial court did not abuse its discretion in awarding costs against Yeubanks, and this decision is affirmed.

Finally, Yeubanks argues that the trial court erred in requiring her to pay the awarded costs prior to refiling her case. The payment of such costs is addressed in Rule 41.04 of the Tennessee Rules of Civil Procedure, which provides:

If a plaintiff who has once dismissed an action in any court *commences* an action based upon or including the same claim against the same defendant, the Court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the new action until the plaintiff has complied with the order.

Tenn. R. Civ. P. 41.04 (emphasis added). The rule clearly contemplates that the determination of when the plaintiff must pay costs previously ordered is made after the case is refiled. Thus, the trial court erred in ordering that the costs be paid prior to the refiling of the case, and this decision must be reversed.

Finally, defendants Dr. Hixson and Pediatric Surgical Group, and Dr. Hertz seek their costs and expenses on appeal, arguing that this appeal, as it relates to them, is frivolous. After a review of the record, we decline to find the appeal frivolous.

The decision of the trial court is affirmed in part and reversed in part, as set forth above. Costs are taxed to the appellant, Christina K. Yeubanks, individually, and as natural parent and surviving next of kin of Sarah Nicole Anderson, and her surety, for which execution may issue, if necessary.

 

_____
HOLLY KIRBY LILLARD, JUDGE