FILED
11/23/2022
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 2, 2022 Session

## LORENTA HOGUE v. P&C INVESTMENTS, INC. ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 19-0635-II          Anne C. Martin, Chancellor**

---

### No. M2021-01335-COA-R3-CV

---

This is an appeal from a jury verdict holding a real estate agent liable for common law negligence, intentional misrepresentation and fraud, negligent misrepresentation, and violation of the Tennessee Real Estate Broker License Act for his failure to disclose flooding and water intrusion issues at a home he had listed for sale. The jury awarded the plaintiff, a first-time home buyer, compensatory and punitive damages. The real estate agent appeals the jury's verdict holding him liable for intentional misrepresentation and fraud, the admission of certain expert testimony, the admission of opposing counsel's alleged prejudicial statements during closing argument, the amount of compensatory damages, and the award of and amount of punitive damages. Finding that the trial court failed to follow the appropriate procedures in reviewing the jury's award of punitive damages, we vacate the award of punitive damages and remand the case for further proceedings. In all other respects, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Vacated and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

George R. Fusner, Jr., Brentwood, Tennessee, for the appellant, Jason Catalogne.

Charles Ronald Lux and Edward Alexander Herbert, Nashville, Tennessee, for the appellee, Lorenta Hogue.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

P&C Investments, LLC ("P&C"), a real estate company operated by Selena Catalogne, purchased a home located at 2509 Old Matthews Road in Nashville, Tennessee ("the property") in August 2016. P&C improved the property, including, among other things, renovating the basement and installing water remediation systems. Jason Catalogne ("Mr. Catalogne"), Selena Catalogne's husband, was involved in the process of making improvements and renovations to the property. Mr. Catalogne also represented P&C Investments as its real estate agent when P&C desired to list the property for sale. During P&C's ownership of the property, there were instances of water intrusion into the garage and basement, and Mr. Catalogne had conversations with Metro Nashville Water Services ("Metro Water") about the water issues at the property. P&C briefly rented out the home through a corporate housing service but then decided to sell the home in the spring of 2018. The real estate transaction following P&C's renovation and listing of the property is the subject of this appeal.

Lorenta Hogue, a first-time home buyer, became interested in the property and wished to see it. Ms. Hogue's real estate agent was her sister, Jennifer Garth, who arranged for Mr. Catalogne to show Ms. Hogue the property while Ms. Garth was out of town. Ms. Hogue and her father, John Simpson, toured the property together. Ms. Hogue described the showing of the property as follows:

> Mr. Catalogne was there and he led us through the front. We went through the front door and, you know, walked around, looked at the house upstairs. Mr. Catalogne was pretty much right there every step of the way as we were looking at the house.
> . . . .
> And then we proceeded to go downstairs with Mr. Catalogne. . . . And when I came downstairs, I did kind of notice a faint kind of moisture kind of scent like of a -- kind of like a wet dog type odor, which that didn't really concern me much, because the house that I grew up in, we had a basement. So, it was always kind of a musty smell. So, that didn't really, you know, bother me about that.
> But as I kept going around the basement, the next thing I saw was that the shoe molding was missing at the bottom of the -- this, the shoe molding, it was missing around the whole basement. And I said this is a newly renovated house. I said why wouldn't the owner, you know, the seller have put the shoe molding on. And Mr. Catalogne, he was -- we were kind of standing over in this area, and he had said to me, oh, that, you know, I'm sure, you know, the owner or the seller would be willing to put those on, you

- 2 -

just need to tell your agent to put that -- you know, if you decide to put a contract on this house, just tell your agent to do that.

So, I said okay. I went and I looked at the garage. And then we -- when we got over to the door, Mr. Catalogne did -- he opened that door up and he said, you know, here is the sump pump, I put a new one in. And I didn't think anything about the sump pump being there other than, you know, like he had kind of expressed about other things in the house, you know, he put something in like as an upgrade or something.

So then we proceeded to go to the backyard. I noticed there were -- now, I know it's a French drain, but a drain back there. He called it a French drain. And he said, you know, this is part of what helps to take the water out from the parking area back there. And that's basically all that we kind of discussed.

In contrast, Mr. Catalogne testified that while standing at the rear of the home in the parking area, Mr. Simpson asked about the drainage ditch, and Mr. Catalogne said to Mr. Simpson and Ms. Hogue, who he believed was within earshot, that, "This place had three water intrusions but we installed this; and after we installed it there hasn't been any[]more problems."

Ms. Hogue submitted an offer to purchase the property. P&C and Ms. Hogue engaged in negotiations and eventually entered into a contract for the sale of the home on May 8, 2018. P&C prepared a Tennessee Residential Property Condition Exemption Notification form (the "Exemption Notice). The Exemption Notice includes the following provision:

> Buyer is advised that no representation or warranties, express or implied, as to the condition of the property and its improvements, are being offered by Seller except in the case where transfer involves the first sale of a dwelling in which builder offers a written warranty and those required by seller pursuant to Tenn. Code Ann. §§ 66-5-212 and 66-5-213. Furthermore, the Buyer should make or have made on the Buyer's behalf a thorough and diligent inspection of the property.

Ms. Hogue acknowledged receipt of the Exemption Notice on May 15, 2018. In addition, Mr. Catalogne executed a Personal Interest Disclosure and Consent form which indicated that an immediate family member was the person selling the Property. Ms. Hogue also acknowledged the receipt of this disclosure on May 15, 2018.

Ms. Hogue then had a home inspection and a termite inspection completed on the property. The home inspection revealed minor issues, but it did not reveal any concerns regarding water intrusion or standing water in the downstairs area. Soon thereafter, the parties agreed upon a Repair/Replacement Amendment listing items that required repair.

On June 5 and 6, 2018, the parties executed an Amendment to Purchase and Sale Agreement stating: "1) The purchase price will be $243,000[, and] 2) Seller has satisfied all of the repair requests as agreed to in the Repair Amendment. House is sold AS-IS." Ms. Hogue and her fiancé had a second walk through at the property during which Mr. Catalogne provided her with additional information about the sump pump and the French drain. The parties closed on the property on July 3, 2018, and Ms. Hogue took possession.

About one month after purchase, Ms. Hogue began to repeatedly experience water intrusion in her garage and basement. Ms. Hogue filed a Complaint against P&C and Mr. Catalogne (collectively, "defendants") alleging that the defendants did not disclose the history of water intrusion at the property despite their knowledge and duty to disclose the same. Ms. Hogue asserted causes of action for negligent misrepresentation, unjust enrichment, negligence, intentional misrepresentation and fraud, and violation of the Tennessee Real Estate Broker License. Defendants moved for summary judgment, and the trial court granted summary judgment on all counts against P&C and dismissed P&C from the case.[1] The court granted summary judgment on the unjust enrichment claim against Mr. Catalogne but declined to dismiss the other counts against him, finding disputed material facts existed on each cause of action. Mr. Catalogne filed a motion for election of remedies seeking to require Ms. Hogue to elect damages of either 1) cost to repair the property or 2) diminution in value of the property pre-trial. The trial court denied Mr. Catalogne's request but held that, Ms. Hogue "cannot recover[] for both elements. The Jury Instructions and Verdict Form will contain instructions for the jury to choose one measure of damages upon which a judgment [may be] entered."

The case proceeded to a jury trial, at which the following six witnesses testified: Ms. Hogue; Ms. Garth; John Simpson; John Michael Corn (environmental consultant and engineer with expertise in "ground and surface water" who testified as Ms. Hogue's expert); Barbara "Bobbie" Noreen (a real estate broker with fifty years of experience who testified as Ms. Hogue's expert on the real estate "professional standard of conduct and ethics and marketability and evaluation of real estate for sale"); and Mr. Catalogne. Mr. Catalogne's attorney made a motion for directed verdict at the close of Ms. Hogue's proof, which the trial court denied. Mr. Catalogne proceeded to put on his proof, but he did not renew his motion for directed verdict at the close of the evidence. The jury returned a verdict in favor of Ms. Hogue and awarded her $243,000 in compensatory damages (the value of the purchase price of the home). The court proceeded to the second phase of trial and conducted a hearing on the amount of punitive damages. The jury deliberated and awarded Ms. Hogue $250,000 in punitive damages.

On August 26, 2021, Mr. Catalogne filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial and a Motion to Alter or Amend the

---

[1] P&C is not participating in this appeal.

Judgment by Granting Remittitur. On August 28, 2021, Ms. Hogue filed a Motion for Discretionary Costs and Pre-Judgment and Post-Judgment Interest. The trial court granted Ms. Hogue an award of discretionary costs in the amount of $1,251.15 and denied any pre-judgment interest. The court summarily denied Mr. Catalogne's post-trial motions. Mr. Catalogne appeals asserting the following issues, as articulated by him:

1) Whether John Corn should not have been admitted as an expert in this case because Mr. Corn was not qualified to testify on the subject matter; and because Mr. Corn's testimony was unreliable.
2) Whether Plaintiff's claims for intentional misrepresentation and fraud should have failed?
3) Whether Plaintiff's counsel made a number of prejudicial statements during closing arguments that affected the outcome of the trial and warrant[ed] a new trial?
4) Whether the award of damages was excessive because Plaintiff failed to mitigate any damages?
5) Whether the award of compensatory damages was excessive and contrary to the law?
6) Whether Plaintiff should have been awarded punitive damages and whether said award was excessive and contrary to law?

STANDARD OF REVIEW

Tennessee Rule of Appellate Procedure 13(d) narrowly limits the role of the appellate courts in reviewing a jury's verdict and requires that a jury's findings of fact "be set aside only if there is no material evidence to support the verdict." Appellate courts are not empowered "to weigh the evidence, to determine the credibility of the witnesses, or to resolve conflicts in the testimony." *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210 (Tenn. Ct. App. 2008). When reviewing the record to determine whether it contains material evidence to support a jury's verdict, "the appellate court must review the record and 'take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence.'" *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 298 (Tenn. 2017) (quoting *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501 (Tenn. 2012)). "The process of ascertaining whether evidentiary support exists for a jury's verdict is very deferential toward the verdict." *Duran*, 271 S.W.3d at 204 (citing *Barrett v. Vann*, No. E2006-01283-COA-R3-CV, 2007 WL 2438025, at *11 (Tenn. Ct. App. Aug. 29, 2007); *Ballard v. Serodino, Inc.*, No. E2004-02656-COA-R3-CV, 2005 WL 2860279, at *3 (Tenn. Ct. App. Oct. 31, 2005)). When an appellant requests this Court to review the evidentiary foundation for a jury's verdict, we must:

[K]eep in mind that the Constitution of Tennessee assigns this task to the jury. *Smith v. Sloan*, 225 S.W.2d 539, 541 (Tenn. 1949); *Jackson v. B.*

- 5 -

*Lowenstein & Bros., Inc.*, 136 S.W.2d 495, 496 (Tenn. 1940). Appellate courts are not a jury of three with the prerogative to re-weigh the evidence, *Whaley v. Rheem Mfg. Co.,* 900 S.W.2d 296, 300 (Tenn. Ct. App. 1995); *Lowe v. Preferred Truck Leasing, Inc.*, 528 S.W.2d 38, 41 (Tenn. Ct. App. 1975), or to determine where the "truth" lies. *D.M. Rose & Co. v. Snyder*, 206 S.W.2d 897, 901 (Tenn. 1947); *Davis v. Wilson*, 522 S.W.2d 872, 875 (Tenn. Ct. App. 1974). Nor are they empowered to substitute their judgment for the jury's, *Grissom v. Modine Mfg. Co.*, 581 S.W.2d 651, 652 (Tenn. Ct. App. 1978), even if they conclude that the evidence might well have supported a different conclusion, or that the jury did not weigh the evidence well or that they would have reached a different conclusion had they been members of the jury.

*Id.* at 204-05 (footnotes omitted). In sum, where there is material evidence to support the jury's verdict, we are bound to affirm it.

ANALYSIS

A. Intentional Misrepresentation and Fraud

As we understand his argument, Mr. Catalogne asserts that the evidence is not legally sufficient to support a finding that Ms. Hogue acted with "due diligence," and therefore, her claim for intentional misrepresentation and fraud "should have failed." Although not specifically phrased as such, we surmise that Mr. Catalogne is asserting on appeal that the trial court committed reversible error in denying his motion for directed verdict on Ms. Hogue's intentional misrepresentation and fraud claims.[2] In response, Ms. Hogue asserts that Mr. Catalogne waived his ability to challenge the sufficiency of the evidence by failing to renew his Tenn. R. Civ. P. 50 motion for directed verdict at the close of all proof, and in any event, there is material evidence to support the jury's verdict.

"A motion for directed verdict provides a vehicle for deciding questions of law; the question presented is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 49 (Tenn. Ct. App. Aug. 5, 2013) (citing *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002)). Phrased another way, "[t]he question of whether evidence is sufficient to support a jury verdict is tested by a motion for a directed verdict." *Steele v. Columbia/HCA Health Care Corp.*, No. W2001-01692-COA-R3-CV, 2002 WL 1000181, at *3 (Tenn. Ct. App. May 13, 2002). When ruling on a motion for directed verdict, the trial and appellate courts:

---

[2] Indeed, the substance of his briefing on appeal is recycled nearly verbatim from his post-trial motion for judgment notwithstanding the verdict.

must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Sauls v. Evans*, 635 S.W.2d 377 (Tenn. 1982); *Holmes v. Wilson*, 551 S.W.2d 682 (Tenn. 1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn. 1980).

*Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at *28 (Tenn. Ct. App. Aug. 6, 2018) (quoting *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994)).  Because Mr. Catalogne has challenged the sufficiency of the evidence with respect to the jury's finding on the claims for intentional misrepresentation and fraud, we continue by examining his issues within the framework of this standard of review.

Regarding the timing of presenting a Tenn. R. Civ. P. 50 motion for directed verdict and the ability to preserve the issue for appeal, Tenn. R. Civ. P. 50.02 provides, in relevant part:

Whenever a motion for a directed verdict *made at the close of all the evidence* is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 30 days after the entry of judgment a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned, such party, within 30 days after the jury has been discharged, may move for a judgment in accordance with such party's motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

(emphasis added).  This Court has held that a motion for directed verdict "must be made at the conclusion of all the proof in order for it to be considered by the trial court on a post-trial motion and by this court on appeal." *Potter v. Tucker*, 688 S.W.2d 833, 835 (Tenn. Ct. App. 1985); *see also McLemore ex rel. McLemore v. Elizabethton Med. Invrs., Ltd. P'ship*, 389 S.W.3d 764, 778 (Tenn. Ct. App. 2012) ("For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made *at the conclusion of all of the proof* and renewed in a post judgment motion following the jury's verdict.") (citing *Steele*, 2002 WL 1000181, at *3)); Robert Banks, Jr. & June F. Entman, Tennessee Civil Procedure § 12-1[c] ("[A] party must first move for directed

verdict before the case is submitted to the jury in order to be able to obtain a post-verdict entry of a favorable judgment on the basis of the legal insufficiency of the prevailing opponent's evidence.").

In this case, there is no dispute that Mr. Catalogne moved for a directed verdict at the close of Ms. Hogue's proof, and the trial court denied his motion. Mr. Catalogne also concedes that his trial counsel went forward with additional proof and, at the close of the case, he did not move for or renew his motion for a directed verdict. In his reply brief, Mr. Catalogne acknowledges that Tenn. R. Civ. P. 50.02 requires a motion for directed verdict to be raised at the close of all the proof; however, he urges this Court to "follow the modern trend taken in federal courts, which no longer requires renewal of a motion for directed verdict at the close of all the proof." Mr. Catalogne cites to the advisory comments of Fed. R. Civ. P. 50(b) which states that the federal rule was amended in 2006 to:

> permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence . . . .
>
> This change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence. *Although the requirement has been clearly established for several decades, lawyers continue to overlook it.* The courts are slowly working away from the formal requirement. The amendment establishes the functional approach that courts have been unable to reach under the present rule and makes practice more consistent and predictable.
>
> Many judges expressly invite motions at the close of all the evidence. The amendment is not intended to discourage this useful practice.

(emphasis added). As explained below, and in keeping with prior caselaw on this issue, we decline to adopt the approach Mr. Catalogne suggests.

This Court confronted the issue of waiver of the right to appeal a trial court's ruling on a motion for directed verdict in the case of *Parker v. Epstein Enterprises, LLC*, No. W2019-00311-COA-R3-CV, 2020 WL 2731234, at *12 (Tenn. Ct. App. May 26, 2020). The appeal in *Parker* concerned a jury's verdict finding the owner of an apartment complex liable in a vicious dog bite case. *Parker*, 2020 WL 2731234 at *1-8. At trial, the defendants moved for directed verdict at the close of plaintiff's proof, but they failed to renew the motion for directed verdict at the close of all evidence. *Id.* at *12. On appeal, the defendants urged this Court to reverse the trial court's ruling on their motion for directed verdict for several reasons, including that the evidence was not sufficient to show that the owner of the apartment complex had knowledge of the dogs' vicious tendencies. *Id.* at *11. In response, the plaintiffs argued that the defendant waived the right to appeal the trial court's denial of the motion for directed verdict because, although the defendants

moved for directed verdict at the close of the plaintiff's proof, "they did not renew their motion at the close of all proof." *Id.* at \*12. Just as Mr. Catalogne has requested in this appeal, the defendants in *Parker* asked this Court to follow the "'modern trend'" and disregard the requirement that the Tenn. R. Civ. P. 50 motion be made at the close of all the evidence. *Id.* This Court sided with plaintiffs and held the issue was waived, stating:

> As the Tennessee Supreme Court explained in *State v. Thompson*, 549 S.W.2d 943, 945 (Tenn. 1977):
>
>> If a motion [for directed verdict] made at the conclusion of the plaintiff's proof is overruled, the defendant must stand upon his motion, and rest his case without offering proof, in order to have the record at that point preserved for appellate review. If the motion is overruled and the defendant does not stand upon the motion, but rather proceeds to offer evidence, then it is necessary for the defendant to "renew" his motion actually to make another motion at the end of all of the evidence in order to have the same considered. Both the trial and appellate courts then review the entire record, not just the plaintiff's case in chief, in determining whether the defense motion should be granted.
>
> . . . .
>
> The law in Tennessee is well-established on this issue, and it is not the role of this Court to depart from it. *See, e.g.*, *Searle v. Bryant*, 713 S.W.2d 62, 66 (Tenn. 1986) ("It is well-settled that a defendant waives his right to rely on error in the denial of his motion for directed verdict made at the end of the plaintiff's proof if he goes forward with his own proof rather than resting on the motion."); *Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at \*28 (Tenn. Ct. App. Aug. 6, 2018) *perm. app. denied* (Tenn. Jan. 17, 2019) ("[F]ollowing the denial of Defendants' motion for directed verdict at the close of Plaintiff's proof, Defendants chose to present their own evidence. As such, consideration of the trial court's initial decision to deny the motion for directed verdict is waived."); *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 778 (Tenn. Ct. App. 2012) ("For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict."); *McDonald v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2004-02852-COA-R3-CV, 2006 WL 846000, at \*3 (Tenn. Ct. App. Mar.

31, 2006) ("Metro failed to renew its motion for a directed verdict at the close of all the evidence. Failing to do so constituted a waiver of the issue."); *Steele v. Columbia/HCA Health Care Corp.*, No. W2001-01692-COA-R3-CV, 2002 WL 1000181, at *3 (Tenn. Ct. App. May 13, 2002) ("[I]n   order for this Court to review the sufficiency of the evidence on appeal, the motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict."); *Cortez v. Alutech, Inc.*, 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996) ("Once Appellants moved for a directed verdict at the close of Appellees' proof, it was incumbent upon them to renew their motion at the close of all the proof as an initial step to preserving the issue for review on appeal."); *Boyd v. Sears, Roebuck & Co.*, 1986 WL 3162, at *1 (Tenn. Ct. App. Mar. 12, 1986) ("When a defendant moves for a directed verdict at the conclusion of plaintiff's proof but fails to renew the motion at the conclusion of all the proof, it waives its right to raise the issue on appeal."); *Potter v. Tucker*, 688 S.W.2d 833, 835 (Tenn. Ct. App. 1985) ("The motion must be made at the conclusion of all the proof in order for it to be considered by the trial court on a post trial motion and by this court on appeal.").

*Id.* at *12-13. In keeping with this precedent, we find that because Mr. Catalogne failed to renew his Tenn. R. Civ. P. 50 motion for directed verdict at the close of all proof, he waived appellate review of whether the evidence of Ms. Hogue's due diligence was sufficient to support the jury's verdict on her claim for intentional misrepresentation and fraud.

Nevertheless, we proceed to review the record to determine whether any material evidence exists to support the jury's verdict. To succeed on a claim for intentional or fraudulent misrepresentation, a plaintiff must prove:

1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Metro. Gov't of Nashville & Davidson Cty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)). "A party may be held liable for concealing or failing to disclose a material fact to the same extent that the party may be held liable for intentional misrepresentation." *Pitz v. Woodruff*, No. M2003-01849-COA-R3-CV, 2004 WL 2951979, at *8 (Tenn. Ct. App. Dec. 17, 2004). Therefore, in order to establish a claim for fraudulent concealment or fraudulent non-disclosure, a plaintiff "must show that (1) the defendant had knowledge of a material existing fact or condition, and that (2) the defendant had a duty to disclose the

fact or condition." *Id.* (citing *Lonning v. Jim Walter Homes, Inc.*, 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986)). "Although there may be a duty to disclose material facts, a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012) (citing *Simmons v. Evans*, 206 S.W.2d 295, 296-97 (Tenn. 1947); *Lonning*, 725 S.W.2d at 684).

Mr. Catalogne's singular argument with respect to the claim of fraudulent misrepresentation is that the evidence is not legally sufficient to support a finding that Ms. Hogue acted with "due diligence" which negated Mr. Catalogne's duty to disclose the water intrusion.[3] As we have explained, it is not our function to weigh the evidence or determine the credibility of the witnesses, we simply look for material evidence to support the verdict. Here, Mr. Catalogne concedes that Ms. Hogue hired a home inspector who did not find evidence of water intrusion. In addition, Mr. Catalogne testified that the damage from water intrusion was repeatedly remedied by P&C prior to listing the property for sale:

> Q. How many times did you have to rip out the basement because of flooding damage?
> A. Twice.
> Q. And each time the water flooded into the property you ripped out the drywall?
> A. Right. It was cut. The insulation was removed. The studs were cleaned with industrial cleaner. And then floor dryers – industrial size floor dryers and dehumidifiers were brought in. Once everything was satisfactorily dried, new insulation and drywall installed then painted and new baseboards.
> Q. Each time that happened you did all of that and you put it back on the market?
> A. Yes.

The evidence showed that each time water intrusion damaged the property during the time P&C owned it, P&C repaired the damage such that it was not obvious that the home had ever experienced water intrusion into the basement. Furthermore, Ms. Hogue hired a home inspector who did not discover or disclose any prior water intrusion issues. This evidence provides material support for the jury's conclusion that Ms. Hogue acted with due diligence in pursuing her purchase of the home. Any other conclusion would require substitution of this Court's judgment for that of the jury, which we cannot do. Therefore, we affirm the jury's verdict on the claim of intentional misrepresentation and fraud because 1) Mr. Catalogne waived appellate review of whether the evidence of Ms. Hogue's due diligence is sufficient to support a jury verdict on her claim for intentional misrepresentation and

---

[3] Mr. Catalogne does not attack any other element of the cause of action of intentional misrepresentation and fraud, nor does he make any assertion of error with respect to the jury instructions.

fraud by failing to move for directed verdict at the close of her proof, and 2) material evidence supports the jury's finding on the issue of her due diligence.

###### B. Failure to Object to Expert Witness Testimony

Mr. Catalogne insists that Ms. Hogue's expert, John Corn, "should not have been admitted as an expert in this case because Mr. Corn was not qualified to testify on the subject matter; and because Mr. Corn's testimony was unreliable." Ms. Hogue argues that this issue is waived, pointing out that Mr. Catalogne failed to file a pre-trial motion attacking Mr. Corn's qualifications, that he did not object to the specific testimony that he complains of at trial, and that he neglected to raise the issue of Mr. Corn's qualifications in his post-trial briefing.

"[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). Thus, a trial court's decision to exclude or admit an expert is reviewed under the abuse of discretion standard. *Wortham v. Kroger Ltd. P'ship I*, No. W2019-00496-COA-R3-CV, 2020 WL 4037649, at *18 (Tenn. Ct. App. July 16, 2020) (citing *Holder v. Westgate Resorts Ltd.*, 356 S.W.3d 373, 376 (Tenn. 2011)). Under the abuse of discretion standard, a trial court's ruling "'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). Generally speaking, a trial court should "admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703."[4] *Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011).

Turning to Ms. Hogue's waiver argument, we note that a litigant's failure to "make a timely, specific objection in the trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal." *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990) (citations omitted); *see* TENN. R. EVID. 103(a)(1) (stating that error may not be predicated on the admission of evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context."); TENN. R. APP. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party

---

[4] Tennessee Rules of Evidence 702 and 703 govern the admissibility of expert proof. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge skill, experience, training, or education may testify in the form of an opinion or otherwise." TENN. R. EVID. 702. Rule 703 requires the underlying data upon which the expert relies to be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." TENN. R. EVID. 703.

responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  The rationale for requiring an objection at trial has been explained by our Supreme Court as follows:

> Any other rule would result in setting a trap for the other side of the controversy. When objection is made to evidence, and specified, this notification may enable opposing counsel to obviate it, and thus make the evidence competent, but, if the party making an erroneous objection should be allowed to withhold a good objection and make that in the appellate court, where there can be no possibility of avoiding the difficulty by other evidence, this would give a very great advantage to the party so withholding his real objection, and result in corresponding disadvantage and injustice to the opposing litigant.

*Middle Tenn. R.R. Co. v. McMillan*, 184 S.W. 20, 24 (Tenn. 1916).  Our Supreme Court has also explained:

> "even in cases where error might exist, a litigant will not be permitted to raise questions and issues on appeal that have not first been presented to the trial court. The trial court must be given the opportunity to correct errors in the conduct of a trial such as the erroneous admission of evidence before a litigant will be able to seek reversal on appeal."

*Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 146 (Tenn. 2017) (quoting *In re Billing & Collection Tariffs of S. Cent. Bell*, 779 S.W.2d 375, 380 (Tenn. Ct. App. 1989)).

Mr. Catalogne complains that "Mr. Corn never worked in the residential sector" and that he "was paid by Plaintiff to present the most extreme and expensive remediation method to the jury."  We begin by reviewing the testimony of Mr. Corn to determine whether any objections were made regarding Mr. Corn's qualifications and expertise in engineering and ground/surface water at trial.  After detailing Mr. Corn's relevant experience and educational background, Ms. Hogue's counsel tendered Mr. Corn as an expert in engineering and ground/surface water.  Mr. Catalogne's counsel then engaged in *voir dire* with Mr. Corn.  At the conclusion of *voir dire*, the trial court presented Mr. Corn as an expert, and made the following statements:

> THE COURT: I'm just trying to think about, for the record, what to say the extent of his expertise is. So the Court is going to recognize Mr. Corn as an engineer with an expertise in ground water, which is a little more uncomfortably broad than I would normally like; *but I'm going to allow* [Mr. Catalogne's attorney] *to object, if you perceive -- if he perceives that the area is outside of what has been presented as Mr. Corn's expertise*. Since I don't

- 13 -

know where he's going to go, I'm just going to – I'm going to recognize him as an expert, but just – I'm a little unclear about the breadth of his testimony.

Thus, the court urged Mr. Catalogne's counsel to object if Mr. Corn went afield of his area of expertise. However, no objection was lodged to Mr. Corn's qualifications at the time he was tendered as an expert. In his reply brief, Mr. Catalogne points to a single objection raised during Mr. Corn's testimony that he believes satisfies the requirement that a contemporaneous objection be made at trial. The context of the objection is as follows, and the specific objection is italicized:

Q. Approximately how often does the area get a substantially heavy rainfall that might be more than -- how much water would be like an inch in a day? Is that a lot of water, because I don't

A. Yes. Based on, I guess, the specific flood that Ms. Hogue had, I think it was in December of 2018, believe that's the date, on that day we had 1.77 inches of water measured at the Inglewood site and 2.23 inches in a day measured at the Whites Creek area.

Q. So that's the example of the rainfall where Ms. Hogue had told you she had experienced a large flood?

A. Correct.

Q. Have we -- previous to that what were some rainfall numbers that fell in Nashville, essentially? How many instances did we have like that?

[MR. CATALOGNE'S ATTORNEY]: *Your Honor, I'm not certain he's qualified to speak to this. He's using information from something else, so it's coming in as hearsay. How can he tell? He's referring to something. We haven't established that that's a reliable source.*

THE COURT: Let me ask you, Mr. Lux, I do think testifying about amounts of rainfall [is] within[] his expertise of ground water -- or surface water, I'm sorry; but I do think a foundation needs to be laid as to the source of this information and what learned treatise he would be relying on it for it. So if you will cover that ground for us, Mr. Lux –

MR. LUX: Sure.

THE COURT: -- so we have a little more of a basis of how this information is determined.

BY MR. LUX: Q. Mr. Corn, as an engineer specializing in surface and ground water, how are you able to determine what the rainfall is on a particular day or over a particular time period?

A. With our things called rain meters. So USGS is the public entity. They publish –

Q. Who is the USGS? I don't mean to cut you off.

A. Sure. United States Geologic Survey.

Q. This is a –

A. It's a public federal program.

- 14 -

Q. Is that a common source for engineers such as yourself to gain this type of information?

A. Yes. They have thousands and thousands of gauges on rivers as well as rain gauges in areas. They collect water fall examples all over the country. They are typically [a] very, very good agency to -- that data is very reliable, historically.

The only objection Mr. Catalogne's counsel made during Mr. Corn's testimony was regarding the source of information for determining the amount of rainfall in the area. This hearsay objection does not relate to Mr. Corn's qualifications as an engineer or to the methodologies that he used to determine the size of the water remediation system necessary to remedy Ms. Hogue's water intrusion problems. Moreover, Mr. Catalogne does not assign any error on appeal related to the determination of the amount of rainfall at issue in this case. We conclude that because Mr. Catalogne's counsel failed to contemporaneously object regarding Mr. Corn's qualifications at trial, he has waived his ability to seek redress for any error in the court's admission of Mr. Corn as an expert on appeal.[5]  *See Jernigan v. Paasche*, 637 S.W.3d 746, 760 (Tenn. Ct. App. 2021).

C.  Closing Argument

Mr. Catalogne asserts that a new trial is warranted because Ms. Hogue's counsel "made statements of fact not in the record along with highly prejudicial statements of opinion" during closing arguments. Again, Ms. Hogue asserts this argument is waived due to Mr. Catalogne's counsel's failure to contemporaneously object to the argument at trial.

The trial court has the purview to control argument of counsel at trial:

> In general, the control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument. The appellate courts generally will not interfere with the discretionary action of a trial court in refusing to grant a mistrial or a new trial for misconduct of counsel in argument unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel.

*Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995) (citing *Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991)). "The trial court determines what is permitted in

---

[5]  To the extent Mr. Catalogne urges us to find that Mr. Corn's testimony was unreliable, he is asking us to substitute our judgment for that of the jury's, which is not our function on appeal. *Duran*, 271 S.W.3d at 204-05.

the argument of counsel." *Freeman v. Blue Ridge Paper Prods., Inc.*, 229 S.W.3d 694, 712 (Tenn. Ct. App. 2007) (citing *Davis*, 920 S.W.2d at 217). Importantly, any issue regarding the propriety of statements made during closing arguments is waived if raised for the first time in a motion for new trial or on appeal. *See Ward v. Glover*, 206 S.W.3d 17, 39 (Tenn. Ct. App. 2006) (quoting Lee v. Lee, 719 S.W.2d 295, 299 (Tenn. Ct. App. 1989)) ("'An objection to the remarks or conduct of counsel must be made at the trial and a ruling had thereon, or they will not be considered on appeal.'").

We have reviewed the closing arguments proffered by the parties, and we have determined that any argument predicated on the alleged prejudicial closing statements of Ms. Hogue's counsel is waived because Mr. Catalogne's counsel failed to contemporaneously object to the statements he now complains of.[6]

## D. Compensatory Damages

Mr. Catalogne argues that the award of compensatory damages was excessive and that cost of repair should have been the measure of damages. Ms. Hogue asserts the cost of repair is not the appropriate measure of damages for an intentional misrepresentation cause of action and that the evidence supports the jury's award.

We begin by considering the appropriate measure of damages in an action for fraudulent misrepresentation. In such cases, our Supreme Court has adopted the measure of damages outlined in the Restatement (Second) of Torts:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) *the difference between the value of what he has received in a transaction and its purchase price or other value given for it*; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
> (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*Boling v. Tenn. State Bank*, 890 S.W.2d 32, 35 (Tenn. 1994) (RESTATEMENT (SECOND) OF TORTS §549 (1977)) (emphasis added); *see also Maddox v. Olshan Found. Repair and*

---

[6] Furthermore, Mr. Catalogne's brief does not provide any citation to where any objections were lodged with the trial court. Rule 6 of the Rules of the Court of Appeals of Tennessee provides that arguments must be accompanied by "[a] statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded." TENN. R. CT. APP. 6(a)(2). Mr. Catalogne's counsel's responsive closing argument does not constitute an objection to Ms. Hogue's counsel's argument.

*Waterproofing Co. of Nashville, L.P.*, No. M2018-00892-COA-R3-CV, 2019 WL 4464816, at *23 (Tenn. Ct. App. Sept. 18, 2019). Importantly, "'[t]he measure of damages and the fixing of the value of the property are to be determined at the time of the transaction.'" *Dixon v. Chrisco*, No. M2018-00132-COA-R3-CV, 2018 WL 4275535, at *7 (Tenn. Ct. App. Sept. 7, 2018) (quoting *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 233 (Tenn. Ct. App. 1976)). When reviewing a jury's award of compensatory damages, an appellate court is to "determine whether there is material evidence to support the jury's verdict." *Massingille v. Vandagriff*, No. M2012-01259-COA-R3-CV, 2013 WL 5432893, at *4 (Tenn. Ct. App. Sept. 24, 2013) *perm. app. denied* (citing *Harper v. Watkins*, 670 S.W.2d 611, 631 (Tenn. Ct. App. 1983); TENN. R. APP. P. 13(d)).

As an initial matter, in light of the precedence cited above regarding the measure of damages in a fraudulent misrepresentation case, we find no merit in Mr. Catalogne's argument that the cost of repair was the only appropriate measure of damages to apply in this case. Next, we consider whether material evidence supports the amount of compensatory damages the jury found. Bobbie Noreen, Ms. Hogue's expert on a realtor's "professional standard of conduct and ethics, and also on marketability and evaluation of real estate for sale" provided the evidence on the difference between the value of what Ms. Hogue received in the transaction versus the home's purchase price. Ms. Noreen testified as follows:

> Q. Again, based on the 2018 values, which is the time Ms. Hogue bought this property, what would you place the value of the property at in the condition that she bought it with the flooding?
> A. Like right now?
> Q. If we were back in 2018 --
> A. Okay. And there was no mitigation.
> Q. And there was no mitigation and the property condition was known as of flooding, what would the value - -
> A. To the extent that it is?
> Q. Yes.
> A. Zero.
> Q. So zero?
> A. Right.
> Q. And so - -
> A. I mean, I wouldn't know how to even sell this property with knowing what we know.
> Q. Is it your opinion that if you fully disclosed a flooding issue, that this property would be marketable in any way?
> A. Well, it would be the extent of the flooding issue. I mean, there's flooding and then there's flooding. And from the pictures I saw this property is situated in such a way it is not just your average flooding basement that the sump pump will take care of.

I mean, a lot of properties flood in Middle Tennessee, and that's not uncommon. But this one, based on what I have seen and talked with or read from the engineer and what I have seen happens, I'm at a loss of how I would market this property effectively at a price that someone would be willing to take on such an adverse fact.

Q. To sum up, is it your opinion that based on what would need to be done to bring the property up to marketability and based on the disclosure that would have to be made for the flooding, the property's value would be zero?

A. It would be cost prohibitive for anybody to want to take that on to the extent of this particular complexity of flooding, let's put it that way.

Mr. Catalogne provided no expert testimony to refute Ms. Noreen's testimony on the value and marketability of the property at the time of the sale. Regardless of any countervailing proof, we find that Ms. Noreen's testimony constitutes material evidence to support the jury's award of compensatory damages to Ms. Hogue. Therefore, we affirm the jury's verdict of compensatory damages.

E. Punitive Damages

Punitive damages are available in Tennessee "in the most egregious of cases" and only when the "claimant proves by clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently or recklessly." Tenn. Code Ann. § 29-39-104(a)(1); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992); *Hudson, Holeyfield & Banks, G.P. v. MNR Hosp., LLC*, No. W2019-00123-COA-R3-CV, 2020 WL 4577483, at *9-10 (Tenn. Ct. App. Aug. 7, 2020) (construing the procedure from Tenn. Code Ann. § 29-39-104); *see also Punitive Damages (for cases accruing on or after October 1, 2011)*, 8 TENN. PRAC. PATTERN JURY INSTR., T.P.I.-Civil 14.55A (20th ed. 2020). Our Supreme Court has instructed:

> "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation."

*Overton v. Westgate Resorts, Ltd., L.P.*, No. E2014-00303-COA-R3-CV, 2015 WL 399218, at *4 (Tenn. Ct. App. Jan. 30, 2015) (quoting *Hodges*, 833 S.W.2d at 901) (internal citations omitted). The plaintiff bears the burden of proving the "defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Hodges*, 833 S.W.2d at 901; *see also* Tenn. Code Ann. § 29-39-104(a)(2). "Clear and convincing

evidence" is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges*, 833 S.W.2d at 901 n.3.

In trials where punitive damages are sought, the proceedings must be bifurcated. Tenn. Code Ann. § 29-39-104(a)(1); *Culbreath v. First Tenn. Bank Nat'l Ass'n*, 44 S.W.3d 518, 527 (Tenn. 2001); *Hudson, Holeyfield & Banks, G.P.*, 2020 WL 4577483, at *9-10 (holding that bifurcated proceedings are mandatory in punitive damages cases). In the first phase of the proceedings "the trier of fact . . . shall first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless . . . ." Tenn. Code Ann. § 29-39-104(a)(2). Next, if the defendant is found to have engaged in "malicious, intentional, fraudulent, or reckless conduct, then the court shall promptly commence an evidentiary hearing in which the jury shall determine the amount of punitive damages, if any[.]" Tenn. Code Ann. § 29-39-104(a)(3). Tennessee Code Annotated section 29-39-104(a)(4) sets forth the following factors that "shall" be considered "to the extent relevant" when "determining the amount of punitive damages" in the second phase of the bifurcated proceeding:

> the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; the expense plaintiff has borne in attempts to recover the losses; whether the defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. The trier of fact shall be instructed that the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole[.]

*See also Hudson, Holeyfield & Banks, G.P.*, 2020 WL 4577483, at *9-10.

Following an award of punitive damages by a jury, our Supreme Court has required the trial court to review the award as follows: "[i]n jury cases the trial judge must review the jury's award of punitive damages and 'clearly set forth the reasons for decreasing *or*

*approving* all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed.'" *Culbreath*, 44 S.W.3d at 528 (quoting *Hodges*, 833 S.W.2d at 902) (emphasis added); *see also Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 328 (Tenn. 1996) (emphasizing that the *Hodges* Court "made it very clear that the trial court must thoroughly review any award of punitive damages made by the jury"); *Massingille*, 2013 WL 5432893, at *5 (vacating a jury's award of punitive damages and remanding the case for the trial court to enter a supplemental order setting forth its findings as to the *Hodges* factors[7] and the reasons supporting the award of punitive damages); *McLemore*, 389 S.W.3d at 778 (noting that the Tennessee Supreme Court "instructed trial courts to conduct a special review of a jury's determination of the amount of punitive damages"). Our Supreme Court has summarized the requirement for trial court review of punitive damages as follows:

---

[7] We note that the factors outlined in Tenn. Code Ann. § 29-39-104(a)(4) are essentially identical to the nine factors the Supreme Court identified in *Hodges*, which are as follows:

> (1) The defendant's financial affairs, financial condition, and net worth;
> (2) The nature and reprehensibility of defendant's wrongdoing, for example
> > (A) The impact of defendant's conduct on the plaintiff, or
> > (B) The relationship of defendant to plaintiff;
> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
> (5) The expense plaintiff has borne in the attempt to recover the losses;
> (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;
> (7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;
> (8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and
> (9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges*, 833 S.W.2d at 901-02. We also note that Tenn. Code Ann. § 29-39-104(b) states:

> Nothing in this section shall be construed as creating a right to an award of punitive damages or to limit the duty of the court, or the appellate courts, to scrutinize all punitive damage awards, ensure that all punitive damages awards comply with applicable procedural, evidentiary and constitutional requirements, and to order remittitur when appropriate.

Thus, the enaction of Tenn. Code Ann. § 29-39-104 does not diminish the requirement of a trial court to review the jury's punitive damages award.

Once a jury awards punitive damages, the trial court must review the award to ensure that the wrongdoer's conduct rose to the level where punitive damages are appropriate. *Hodges*, 833 S.W.2d at 902. The trial court thus reviews the evidence to consider whether the jury's findings are supported by clear and convincing evidence and whether the punitive award effectively punishes and deters the defendant from committing the same acts in the future.

*Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 188 (Tenn. 2009). "In the absence of sufficient findings of fact and conclusions of law as to each of the relevant *Hodges* criteria, an appellate court cannot adequately review the trial court's award of punitive damages." *Culbreath*, 44 S.W.3d at 528.[8]

In this case, the jury verdict form from the first phase of trial asked the jurors: "Do you find that Jason Catalogne committed intentional misrepresentation and fraud?" The jury responded affirmatively, checking "yes." The verdict form went on and asked: "Do you find by clear and convincing evidence that Jason Catalogne acted either [f]raudulently, [i]ntentionally, [m]alicioulsy, or [r]ecklessly and that an award of punitive damages should result?" Again, the jury answered affirmatively, checking "yes." The case proceeded to the second phase, which included a brief hearing. The jury was then provided a verdict form asking: "What amount of punitive damages do you award Lorenta Hogue?" The jury wrote "$250,000" on the blank above the signature of the jury foreperson. Thereafter, Mr. Catalogne filed a Motion for a New Trial or to Alter or Amend the Judgment by Granting a Remittitur and a Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial. The trial court summarily denied the motions stating: "Based upon the Motion, together with a contemporaneously filed Affidavit of Jason Catalogne and all attachments thereto, Plaintiff's Response to the Motion, as well as hearing arguments from counsel, it appears unto the Court that the Motion shall be DENIED." There is nothing in the record to suggest that the trial court reviewed the jury's verdict on punitive damages to consider all factors on which the jury was instructed, in particular the factors outlined in Tenn. Code Ann. § 29-39-104(a)(4) (formerly referred to as the "*Hodges* factors"). As our Supreme Court has instructed, this special review by the trial court in punitive damages

---

[8] During the second phase of the trial, when the parties were determining whether to immediately move forward or delay the second phase of trial, Ms. Hogue's attorney acknowledged the trial court's duty to review the award of punitive damages, stating:

> My suggestion was actually going to be go forward with the entire proceeding today, let the Jury make their determination on all the other factors except for financial condition or net worth. *And obviously, the Court is required to review all of the factors anyway.*
>
> If the Jury returns something that is out of line with Mr. Catalogne's net worth or income, then the Court would remit that amount based on information produced at a later date.

cases is an essential review that must be conducted before we can undertake our appellate review. *Culbreath*, 44 S.W.3d at 528. Therefore, as we did in *Massingille v. Vandagriff*, "we must vacate the award and remand the case for the trial court to enter a supplemental order setting forth its findings as to the [Tenn. Code Ann. § 29-39-104(a)(1)] factors and the reasons supporting the award of punitive damages." *Massingille*, 2013 WL 5432893, at *5.

CONCLUSION

For the foregoing reasons, we affirm the jury's verdict with respect to the claim of intentional misrepresentation and fraud; we find any argument regarding the admissibility of Ms. Hogue's expert's testimony and any error in the admission of alleged prejudicial statements during closing argument waived; and we affirm the measure of damages and award of compensatory damages because there was material evidence in the record to support the monetary award. However, because the trial court failed to properly review the award of punitive damages, we vacate the award of punitive damages and remand the case for entry of a supplemental order reviewing all factors on which the jury was instructed, including, but not limited to, the factors outlined in Tenn. Code Ann. § 29-39-104(a)(4). Therefore, the judgment of the trial court is affirmed in part and vacated in part. Costs of this appeal are assessed against the parties equally, for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE